13-4792-cv
Rodriguez v. Village Green Realty, Inc.

# In the
# United States Court of Appeals
## For the Second Circuit

August Term, 2014

No. 13-4792-cv

HEIDI RODRIGUEZ, individually and as parent and natural guardian of the minor child, A.R., and JUAN RODRIGUEZ, individually and as parent and natural guardian of the minor child, A.R.,

*Plaintiffs-Appellants*,

*v.*

VILLAGE GREEN REALTY, INC., d/b/a Coldwell Banker Village Green Realty, and BLANCA APONTE,

*Defendants-Appellees*.\*

Appeal from the United States District Court
for the Northern District of New York.
No. 11-cv-1068 — Thomas J. McAvoy, *Judge*.

ARGUED: SEPTEMBER 12, 2014
DECIDED: JUNE 2, 2015

---

\* The Clerk of the Court is directed to amend the official caption to conform to the above.

Before: LIVINGSTON and DRONEY, *Circuit Judges*, and NATHAN, *District Judge*.[**]

---

Heidi and Juan Rodriguez, parents of minor child A.R., brought suit for disability discrimination under the Fair Housing Act, 42 U.S.C. § 3601 *et seq.* ("FHA"), against Village Green Realty, Inc., a real estate agency, and Blanca Aponte, its agent. The United States District Court for the Northern District of New York (McAvoy, *J.*) granted summary judgment for the defendants. We hold that the district court erred because there was sufficient evidence presented that A.R. qualifies as disabled under the FHA. We also hold that the FHA's prohibition against statements that "indicate[ ] any preference, limitation, or discrimination based on . . . handicap," 42 U.S.C. § 3604(c), may be violated even if the subject of those statements does not qualify as disabled under the FHA. Finally, we hold that the "ordinary listener" standard is not applicable to claims under 42 U.S.C. § 3604(d) for misrepresenting the availability of housing.

Accordingly, we **VACATE** the judgment of the United States District Court for the Northern District of New York and **REMAND**.

---

> SASHA M. SAMBERG-CHAMPION (Michael G. Allen and Timothy M. Smyth, *on the brief*), Relman, Dane & Colfax PLLC, Washington, DC, for *Plaintiffs-Appellants*.

---

[**] The Honorable Alison J. Nathan, of the Southern District of New York, sitting by designation.

ARI I. BAUER (Paul S. Ernenwein, *on the brief*), Catania, Mahon, Milligram & Rider, PLLC, Newburgh, NY, *for Defendants-Appellees*.

Cathy A. Simon and Thomas H. Prouty, Troutman Sanders LLP, Washington, DC; Megan K. Whyte de Vasquez, Washington Lawyers' Committee for Civil Rights and Urban Affairs, Washington, DC, *for the Epilepsy Foundation, Autism National Committee, the State of Connecticut Office of Protection and Advocacy for Persons with Disabilities, National Council on Independent Living, Judge David L. Bazelon Center for Mental Health Law, the Disability Rights Education & Defense Fund, National Disability Rights Network, and AARP as* amici curiae *in support of Plaintiffs-Appellants*.

DRONEY, *Circuit Judge*:

Plaintiffs-Appellants Heidi and Juan Rodriguez, parents of minor child A.R., brought suit for disability discrimination under the Fair Housing Act, 42 U.S.C. § 3601 *et seq.* ("FHA"), against Defendants-Appellees Village Green Realty, Inc., a real estate agency, and Blanca Aponte, its agent. The plaintiffs allege, *inter alia*, that the defendants (1) made housing unavailable on the basis of disability in violation of 42 U.S.C. § 3604(f)(1); (2) provided different

terms, conditions, and privileges of rental housing on the basis of disability in violation of 42 U.S.C. § 3604(f)(2); (3) expressed a preference on the basis of disability in violation of 42 U.S.C. § 3604(c); and (4) misrepresented the availability of rental housing on the basis of disability in violation of 42 U.S.C. § 3604(d). The United States District Court for the Northern District of New York (McAvoy, *J.*) granted summary judgment for the defendants on these claims. This appeal followed.

We hold that the district court erred because there was sufficient evidence presented that A.R. qualifies as disabled under the FHA. We also hold that the FHA's prohibition against statements that "indicate[ ] any preference, limitation, or discrimination based on . . . handicap," 42 U.S.C. § 3604(c), may be violated even if the subject of those statements does not qualify as disabled under the FHA. Finally, we hold that the "ordinary listener" standard is not applicable to claims under 42 U.S.C. §

3604(d) for misrepresenting the availability of housing. Accordingly, we VACATE the judgment of the district court and REMAND.

## BACKGROUND

**I.    Factual Background**

Plaintiffs Heidi and Juan Rodriguez are the parents of minor child A.R.[1] who has Autism Spectrum Disorder and epilepsy. This suit under the Fair Housing Act arose from text messages about A.R. sent to Heidi Rodriguez by defendant Blanca Aponte, a real estate agent.

The Rodriguez family had rented a single family home on a month-to-month basis for two years on property located in Saugerties, New York. The property was owned by Donnie Morelli and included two single family homes and twenty-eight acres. Some time in 2010, the property was listed for sale with defendant real

---

[1] The parties have referred to the minor child by her initials since the initiation of this lawsuit. We will continue to do the same. Heidi and Juan Rodriguez are proceeding in this action individually and also as the parents and guardians of A.R. on her behalf.

estate agency Village Green Realty, Inc. Defendant Aponte served as the listing agent.

On January 20, 2011, Aponte left a letter at the Rodriguez home informing them of Morelli's intention to sell the property to Mansour Farhandian. The letter stated that Farhandian would be willing to continue to rent to the Rodriguez family, but under certain modified terms, including an increased rent, and asked the Rodriguezes to inform Aponte whether they agreed to the new terms. If not, the letter stated, they would have to vacate the premises by March 15, 2011. The Rodriguezes did not immediately inform Aponte as to whether they accepted the new terms.

On January 23, 2011, Morelli entered into a purchase agreement with Farhandian; the agreement anticipated a closing in early March. In order to facilitate the anticipated sale, Aponte continued to try to contact the Rodriguezes to determine whether they intended to accept the new lease terms. She texted Ms.

Rodriguez on January 25 and February 4 inquiring about a response to the letter, but Ms. Rodriguez did not respond.

On February 6, 2011, A.R. suffered two grand mal seizures.[2] Ms. Rodriguez called Morelli from the hospital to inform him about the seizures and tell him that it was "not the time" for her and Mr. Rodriguez to be negotiating with Aponte. J.A. 146. The next day, Aponte texted Ms. Rodriguez:[3] "Hi Please respond to my notices! If you have an attorney please have them get in touch w me," J.A. 230, to which Ms. Rodriguez replied: "Please call Donnie [Morelli] for an update." *Id*. Aponte wrote back: "Will do." *Id.*[4]

This began the exchange of text messages from February 7 to 23 that are the principal subject of this action. On February 7, Aponte wrote to Ms. Rodriguez that she had "[j]ust spoke[n] w[ith]

[2] A grand mal seizure is described later in the text.

[3] Excerpts from the text messages between Aponte and Ms. Rodriguez quote the actual language of the messages, including typographical errors, except where otherwise indicated.

[4] During this period, Ms. Rodriguez was communicating directly with Morelli about A.R.'s condition.

Donnie [Morelli]" and that, "[w]hile [they were] both sympathetic to [Ms. Rodriguez's] situation," Morelli was selling the property and Aponte would "be proceeding with legal action to remove you from [the] premises." *Id.* After several exchanges regarding scheduling a time for Aponte to inspect the Rodriguezes' home, Ms. Rodriguez stated,

> We are not leaving. Where do you want us to go with a sick child? . . . Why do you keep on harassing and insisting that we move? . . . When you were told of my daughter being sick we weren't asking for free rent or anything of the sort. Just to be understood and left alone to deal with her medical issues without being bothered by you asking us to leave our home.

J.A. 231. Aponte replied that she had "not asked you to leave" but that she had received no response from the Rodriguezes about the new owner's rental terms. *Id.* In reply, Ms. Rodriguez complained about the "poorly maintained icy road" near the home and questioned how vehicles could get up the road "[o]r better yet an ambulance for my daughter if needed." *Id.* Aponte responded,

> This has nothing to do with what we were just speaking about[.] Fact is that if I can get up and down emergency vehicles should be able to as well. This has been an unusually cold and snow filled Winter. So maybe you should consider relocating to a better and more easily accessible Location.

*Id.*

A few days later, on February 16, Ms. Rodriguez sent a text message to Aponte stating that she needed to reschedule the inspection because A.R. had suffered the second seizure and needed to return to the hospital for testing. J.A. 232. This led to the following exchange:

> [Aponte (February 16, 7:42 p.m.):] Just spoke w my lawyer for management company.. We will accept your rescheduling appointment for Friday if you provide verification of medical appointment for your daughter. The prospective new owner is very concerned about continuing your lease with you Childs medical situation and will probably

not want to rent to you.[5] I think we need to let you know that we will not be renting to you! Please plan on rel Please make plans to relocate. We will give you Until end of March. Respond to me. . Not to mr Morelli Blanca

[Ms. Rodriguez (February 16, 8:16 p.m.):] What are you talking about?

[Aponte (February 16, 8:42 p.m.):] Exactly what I said. You have cancelled our appointment because of issues with your daughter's illness. We want verification of your appointment.. That being said. . . The new owner has decided not to continue to rent to you because your daughter should be in a more convenient location to medical treatment

[Ms. Rodriguez (February 16, 9:04 p.m.):] You spoke to the new owner that fast and he made a decision not to rent to us because my daughter has seizures? Or is this you decision?

I am confused.

[Aponte (February 17, 7:11 a.m.):] The new owner is concerned by your statement that

---

[5] Aponte admitted that she never communicated with the prospective buyer, Farhandian, concerning A.R's medical condition and that she fabricated this and the following statements that purported to represent Farhandian's view of A.R.'s conditions.

emergency vehicles cannot reach you should your daughter be at risk. Also concerned about you not making place readily available for inspection and thinks I should have a key that is the right of a landlord and his representative. For me, I only have your statement that your daughter us sick Do u have verification?

J.A. 232-33.

On February 23, Aponte reiterated that the new owner was concerned about renting to the Rodriguezes because of Ms. Rodriguez's statement that the home was not "readily accessible to emergency vehicles," which Aponte stated was a "major concern as to liability." J.A. 234-35. She further stated, "I think that your tenancy is over. Will verify after speaking to both Donnie [Morelli] and buyer." J.A. 235.

In addition to learning of A.R.'s medical problems from the text messages from Ms. Rodriguez, Aponte obtained information around the same time about A.R. from the Rodriguezes' neighbor, Tammy Drost. Drost, who lived in the second house on the property

that was being sold, was a special education aide at A.R.'s elementary school, and A.R.'s "personal assistant" at the school. Drost had frequent contact with Aponte and told Aponte that A.R. was autistic, may be epileptic and was placed in a special class at school. Ms. Rodriguez testified at her deposition that she believed that Morelli, who was also aware of A.R.'s diagnoses, seizures, and special educational services, had also told Aponte this information.

Although the sale between Morelli and Farhandian was not completed, Plaintiffs began looking for new housing in late January or early February of 2011, when it became "very apparent that [they] were not wanted," and they moved to another home in September of that year. J.A. 196. In the interim, the Rodriguezes complied with Aponte's request for higher rent beginning in March.

**II.    Proceedings in District Court**

In September 2011, plaintiffs filed this action, alleging that the defendants had violated the Fair Housing Act, 42 U.S.C. § 3601 *et*

*seq.* ("FHA"). In their amended complaint, the plaintiffs claimed that the real estate agency and Aponte had (1) made housing unavailable on the basis of disability in violation of 42 U.S.C. § 3604(f)(1); (2) provided different terms, conditions, and privileges of rental housing on the basis of disability in violation of 42 U.S.C. § 3604(f)(2); (3) expressed a preference on the basis of disability in violation of 42 U.S.C. § 3604(c); and (4) misrepresented the availability of rental housing on the basis of disability in violation of 42 U.S.C. § 3604(d).[6]

The plaintiffs and defendants cross-moved for summary judgment.[7] On October 10, 2013, the district court granted defendants' motion with respect to the claims at issue here, holding that the plaintiffs had not come forward with sufficient admissible

[6] Plaintiffs also brought a claim under 42 U.S.C. § 3617, which has been voluntarily dismissed and is not at issue in this appeal.

[7] The plaintiffs sought only partial summary judgment. The district court granted that motion solely on the question of whether Village Green Realty was vicariously liable for Aponte's actions, which is not at issue in this appeal. The plaintiffs' motion was denied in all other respects.

evidence to allow a reasonable factfinder to conclude that A.R. was disabled as defined by the FHA.[8] *Rodriguez v. Vill. Green Realty, Inc.*, No. 1:11-cv-1068, 2013 WL 5592703, at *9-10 (N.D.N.Y. Oct. 10, 2013) ("*Rodriguez I*"). The plaintiffs moved for reconsideration of the district court's dismissal of their claims under 42 U.S.C. § 3604(c) and (d), arguing that for those claims it is irrelevant whether A.R. is disabled, because these FHA provisions apply to *any* person aggrieved by a statement indicating a preference or discrimination based on handicap or a misrepresentation of availability because of handicap. Although the district court agreed upon reconsideration that subsections (c) and (d) apply more broadly than subsection (f)

---

[8] The FHA uses the term "handicap" rather than "disability." *See* 42 U.S.C. §§ 3602(h), 3604. The FHA definition of "handicap," though, historically was virtually identical to the definition of "disability" in the Americans with Disabilities Act of 1990 ("ADA"), Pub. L. No. 101-336, 104 Stat. 327 (codified as amended at 42 U.S.C. § 12101 *et seq.* (2008)), and disability scholars tend to prefer the term "disability." We will therefore treat the two terms interchangeably and use "disability" in this opinion. *See Bhogaita v. Altamonte Heights Condo. Ass'n, Inc.*, 765 F.3d 1277, 1285 n.2 (11th Cir. 2014) (using the terms interchangeably for similar reasons); s*ee also* Robert G. Schwemm, Housing Discrimination Law and Litigation § 11D:1 n.* (database updated 2014) (discussing the near identity of the statutory definitions under the FHA and ADA).

as to standing to bring a claim, the court still dismissed these claims, finding that there was insufficient evidence that Aponte's statements about A.R. indicated a preference, limitation or discrimination based on handicap, or that a dwelling was not available because of handicap. *Rodriguez v. Vill. Green Realty, Inc.*, No. 1:11-cv-1068, 2013 WL 6058577, at *3 (N.D.N.Y. Nov. 15, 2013) ("*Rodriguez II*").

This appeal followed.

**DISCUSSION**

Plaintiffs contend that the district court erred in dismissing their claims on the basis of lack of disability. Plaintiffs assert that A.R. meets the FHA's definition of disabled because her epilepsy and autism substantially limit her ability to learn. *See* 42 U.S.C. § 3602(h)(1); 24 C.F.R. § 100.201. They also argue, in the alternative, that regardless of whether A.R. is actually disabled under the Act, Aponte "regarded" her as having an impairment that substantially limited her in a major life activity. *See* 42 U.S.C. § 3602(h)(3); 24

C.F.R. § 100.201. Finally, the plaintiffs argue that the district court erroneously concluded that an ordinary listener could not have interpreted Aponte's statements as reflecting disability-based discrimination.

## I. Standard of Review

This Court reviews the district court's grant of summary judgment *de novo. Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 45 (2d Cir. 2002) ("*RECAP*"), *superseded by statute on other grounds*, ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553 ("ADAAA"). Summary judgment is required where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In assessing the record to determine whether there is a genuine issue to be tried as to any material fact, the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom

-16-

summary judgment is sought."[9] *Stone v. City of Mount Vernon*, 118 F.3d 92, 99 (2d Cir. 1997). A fact is "material" for these purposes if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

**II.    Statutory Framework**

This appeal requires us to address the 1988 Amendments to the FHA, which extended the Fair Housing Act's protections against housing discrimination to disabled individuals. *See* Fair Housing Amendments Act of 1988, Pub. L. No. 100-430, 102 Stat. 1619 (codified at 42 U.S.C. § 3601 *et seq.*). We are guided by our decisions interpreting similar language that appeared in the Americans with

---

[9] We note that the 2010 amendments to the Federal Rules of Civil Procedure replaced "issue" with "dispute" because "'[d]ispute' better reflects the focus of a summary-judgment determination." *See* Fed. R. Civ. 56(a) advisory committee's note to 2010 amendment.

Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, prior to the ADA's amendment in 2008.[10]

### A.    Definition of "Handicapped"

The FHA makes it unlawful "[t]o discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap" or "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap." 42 U.S.C. § 3604(f). The Act also forbids the representation "to any person because of . . . handicap . . . that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available." *Id.* § 3604(d).

---

[10] Until 2008, the ADA definition of "disability" was virtually identical to the FHA definition of "handicap," and so the Court's interpretation of the ADA was frequently applied to the FHA. *Compare* 42 U.S.C. § 3602(h), *with* the ADA, § 3, 104 Stat. at 329-30. Congress amended the ADA, including its definition of "disability," in 2008. *See* ADAAA, § 4, 122 Stat. at 3555-57. The FHA, however, was not similarly amended and so our FHA interpretation is still guided by pre-ADAAA cases. *See Bhogaita*, 765 F.3d at 1288 (holding that the FHA should still be interpreted in line with the preamendment ADA).

Both provisions prohibit action taken "because of . . . handicap," and, as such, require that plaintiffs show the existence of a disability within the meaning of the FHA in order to state a claim under these subsections.[11]

To demonstrate a disability under the FHA, a plaintiff must show: (1) "a physical or mental impairment which substantially limits one or more . . . major life activities"; (2) "a record of having such an impairment"; or (3) that he or she is "regarded as having such an impairment."  42 U.S.C. § 3602(h); *see RECAP*, 294 F.3d at 46. Prongs 1 and 3, which we will refer to as the "actually disabled" test

---

[11] We evaluate claims that a defendant discriminated "because of" a disability under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under that framework, the plaintiff must first establish a prima facie case of housing discrimination by showing, among other things, that a relevant person is a member of a protected class – in this case, that the plaintiffs' child is disabled. *See Mitchell v. Shane*, 350 F.3d 39, 47 (2d Cir. 2003). Once the plaintiff establishes "a prima facie case of discrimination, the burden shifts to the defendant to assert a legitimate, nondiscriminatory rationale for the challenged decision. If the defendant makes such a showing, the burden shifts back to the plaintiff to demonstrate that discrimination was the real reason for the defendant's action." *Id.* (citation omitted).

and the "regarded as" test, respectively, are the two definitions relevant here.

**B.  Subsection 3604(c)**

Subsection 3604(c) of the FHA prohibits "mak[ing], print[ing], or publish[ing], or caus[ing] to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on . . . handicap . . . , or an intention to make any such preference, limitation, or discrimination." 42 U.S.C. § 3604(c). This Court has interpreted this provision in the context of racial discrimination to mean that "a plaintiff could bring an action . . . if the defendant's [statements] 'suggest[ed] to an *ordinary reader* that a particular race [was] preferred or dispreferred for the housing in question,' regardless of the defendant's intent." *Ragin v. Harry Macklowe Real Estate Co.*, 6 F.3d 898, 905 (2d Cir. 1993) ("*Ragin II*") (third and fourth alterations in original) (emphasis added) (quoting *Ragin v. N.Y. Times Co.*, 923 F.2d 995, 999 (2d Cir. 1991) ("*Ragin I*")).

## III. Whether A.R. is Disabled

The plaintiffs argue that A.R. is disabled under the FHA because her impairments substantially limit the major life activity of learning or, in the alternative, because Aponte treated A.R.'s impairments as if they substantially limited a major life activity.[12] We hold that the district court erred in granting summary judgment to defendants on the ground that A.R. did not have a disability

[12] The defendants, on appeal, challenge the plaintiffs' standing to bring this suit. Although the plaintiffs contend this issue is not properly before the Court due to the defendants' lack of cross appeal, standing is necessary to our jurisdiction. *RECAP*, 294 F.3d at 46 n.2. That said, the plaintiffs' allegation that Aponte forced them to leave their home because of their daughter's disability and the emotional harm they suffered as a result of Aponte's statements concerning A.R. are sufficient to satisfy the "injury in fact" requirement. *See Leibovitz v. N.Y.C. Transit Auth.*, 252 F.3d 179, 184-85 (2d Cir. 2001); *see also LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412, 424-25 (2d Cir. 1995) ("The FHA confers standing to challenge such discriminatory practices on any 'aggrieved person,' 42 U.S.C. § 3613(a)(1)(A). . . . This definition requires only that a private plaintiff allege 'injury in fact' within the meaning of Article III of the Constitution, that is, that he allege 'distinct and palpable injuries that are "fairly traceable" to [defendants'] actions.' An injury need not be economic or tangible in order to confer standing." (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 375–76 (1982))); *cf. Ragin II*, 6 F.3d at 904 (holding that plaintiffs "confronted by advertisements indicating a preference based on race" had standing to raise a claim under section 3604(c) of the FHA). Defendants also argue that the plaintiffs lack standing because A.R. is not disabled within the meaning of the FHA and therefore the plaintiffs' injuries do not bear a sufficient nexus to discrimination based on disability; we need not reach this argument, though, because – as will be discussed – we find that the plaintiffs have raised a genuine dispute as to whether A.R. is disabled.

within the meaning of the FHA because there is sufficient evidence from which a reasonable jury could conclude that A.R. was either substantially limited in the major life activity of learning or that Aponte regarded A.R. as substantially limited in the major life activities of learning or obtaining housing.

**A.     "Actually Disabled" Under Section 3602(h)(1)**

"[A]n individual is considered disabled [under 42 U.S.C. § 3602(h)(1)] if he or she: (1) suffers from a physical or mental impairment, that (2) affects a major life activity, and (3) the effect is 'substantial.'" *RECAP*, 294 F.3d at 46. "Major life activities include 'functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.'" *Id*. at 47 (quoting, *inter alia*, 24 C.F.R. § 100.201(b)).

The applicable regulations define a "[p]hysical or mental impairment" to include epilepsy and autism. 24 C.F.R. § 100.201(a)(2). Epilepsy is a brain disorder that causes recurring seizures. U.S. Nat'l Library of Med., *Epilepsy*, MedlinePlus,

http://www.nlm.nih.gov/medlineplus/epilepsy.html (last updated Apr. 14, 2015). People with epilepsy can experience different types of seizures, including grand mal and petit mal seizures. U.S. Nat'l Library of Med., *Absence Seizure*, MedlinePlus, http://www.nlm.nih.gov/medlineplus/ency/article/000696.htm (last updated May 12, 2015). Grand mal seizures typically result in rigid muscles, followed by violent muscle contractions and loss of consciousness. U.S. Nat'l Library of Med., *Generalized Tonic-Clonic Seizure*, MedlinePlus, http://www.nlm.nih.gov/medlineplus/ency/article/000695.htm (last updated May 12, 2015). Petit mal seizures, also known as absence seizures, generally involve staring episodes lasting fewer than 15 seconds. U.S. Nat'l Library of Med., *Absence Seizure*, *supra*. People experiencing this type of seizure undergo a change in consciousness or alertness. *Id.*

Autism spectrum disorder is a neurological and developmental disorder that "affects how a person acts and interacts

with others, communicates, and learns." U.S. Nat'l Library of Med., *Autism Spectrum Disorder*, MedlinePlus, http://www.nlm.nih.gov/medlineplus/autismspectrumdisorder.html (last updated May 26, 2015). The "essential features" of the disorder are "persistent impairment in . . . social interaction" and "restricted, repetitive patterns of behavior, interests, or activities." Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 53 (5th ed. 2013) ("DSM-5"). "Manifestations of the disorder . . . vary greatly." *Id*. Deficits in social communication can range from abnormalities in eye contact to failure to initiate or respond to social interactions. *Id*. at 50. One example of characteristic repetitive behavior is "[h]ighly restricted, fixated interests that are abnormal in intensity." *Id*. A diagnosis of autism spectrum disorder requires that these symptoms "limit or impair everyday functioning." *Id*. at 53. "In young children with autism spectrum disorder, lack of social and communication abilities may hamper learning, especially

learning through social interaction or in settings with peers. . . . Extreme difficulties in planning, organization, and coping with change negatively impact academic achievement, even for students with above-average intelligence." *Id.* at 57.

The first question is whether the plaintiffs have provided sufficient evidence to create a genuine dispute that A.R. suffers from an impairment. The plaintiffs' evidence includes a sworn declaration from A.R.'s pediatrician, Dr. Irene Flatau, which states:

> A.R.'s medical history shows that she has been diagnosed with epilepsy since 2010. This causes her to experience grand mal seizures, the most intense type of seizure, during which she loses consciousness and suffers violent muscle contractions, as well as petit mal seizures, also known as "absence" seizures, during which a person briefly and suddenly lapses into unconsciousness.
>
> . . . In addition, A.R. has been diagnosed with Autism Spectrum Disorder[.]

J.A. 229. Ms. Rodriguez also testified that A.R. has been diagnosed with autism, suffers from petit and grand mal seizures, and receives

medical treatment and special services in school for these conditions. This evidence is sufficient to create a genuine dispute as to whether A.R. has a "physical or mental impairment" under the FHA. *See* 24 C.F.R. § 100.201(a)(2).

We must then determine whether the district court erred in holding that there was insufficient evidence from which a reasonable jury could conclude that A.R.'s impairments *substantially limited* her ability to learn. In *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, 534 U.S. 184 (2002), *superseded by statute* ADAAA, § 4, 122 Stat. at 3554, the Supreme Court decided that "substantially limit[s]" in the ADA's definition of "disability" required that an impairment "prevent[] or severely restrict[]" an individual's major life activity. *Toyota Motor*, 534 U.S. at 198; *accord Capobianco v. City of N.Y.*, 422 F.3d 47, 57 (2d Cir. 2005) ("[T]he mere fact that an impairment requires an individual to perform a task differently from the average person does not mean that she is disabled within

the meaning of the ADA . . . .”). “The impairment's impact must . . . be permanent or long term,” *Toyota Motor*, 534 U.S. at 198, and it must be evaluated “with reference to measures that mitigate the individual's impairment,” *Sutton v. United Air Lines, Inc.* 527 U.S. 471, 475 (1999), *superseded by statute*, ADAAA, § 4, 122 Stat. at 3556.[13]

Defendants argue that this Circuit requires the submission of medical evidence to establish a disability under the FHA and that plaintiffs' claims fail for their failure to present admissible medical evidence concerning how A.R.'s epilepsy and autism affected her learning. However, medical evidence as to the extent of an individual's impairment is not always required to survive summary judgment. Neither the ADA or the FHA's text, nor the respective

[13] Congress amended the ADA in 2008 “to reject the standards enunciated by the Supreme Court in Toyota Motor Manufacturing, Kentucky, Inc. v. Williams, 534 U.S. 184 (2002),” and “to reject the requirement enunciated by the Supreme Court in Sutton v. United Air Lines, Inc., 527 U.S. 471 (1999) and its companion cases that whether an impairment substantially limits a major life activity is to be determined with reference to the ameliorative effects of mitigating measures.” ADAAA, § 2(b)(2), (4), 122 Stat. at 3554. As mentioned previously, though, the FHA was not similarly amended and so our FHA interpretation is still guided by pre-ADAAA cases, including *Toyota Motor* and *Sutton*. *See Bhogaita*, 765 F.3d at 1288.

implementing regulations require medical evidence to establish a genuine dispute of material fact regarding the impairment of a major life activity at the summary judgment stage. Instead, *Toyota Motor* requires "[a]n individualized assessment" to determine the existence of a disability. *Toyota Motor*, 534 U.S. at 199. Medical testimony may be helpful to show that an impairment is substantially limiting, but it is not always necessary. *See E.E.O.C. v. AutoZone, Inc.*, 630 F.3d 635, 643-44 (7th Cir. 2010); *Head v. Glacier Nw., Inc.*, 413 F.3d 1053, 1058-59 (9th Cir. 2005).

Our decision in *Heilweil v. Mount Sinai Hospital*, 32 F.3d 718 (2d Cir. 1994), is not to the contrary, as defendants contend. The statement in *Heilweil* that "[n]o medical proof substantiate[d]" the plaintiff's disability claim under the Rehabilitation Act was limited to the context of that case. *Id.* at 723. In *Heilweil*, the issue that required such proof was the extent to which the conceded impairment of asthma limited the plaintiff in the major life activity

-28-

of working. *Id.* at 722-23. The plaintiff claimed that her asthma prevented her from working in the hospital where she had been employed. *Id.* at 723. Both the plaintiff's own statements and those of her doctor showed, however, that her asthma was only exacerbated in a particular unventilated area in the hospital, and not at different locations with different air quality. *Id.* It was in this context that we dismissed the plaintiff's contrary contention that she was unable to work in the general environment of the hospital as mere speculation given the absence of corroborating medical evidence. *Id.* Thus, because the plaintiff only showed that she was unable to work in one particular area of the hospital due to her asthma, she did not raise a genuine issue of material fact as to whether she was substantially limited in the major life activity of working. *Id.* at 723-24.

As the outcome of *Heilweil* reflects, conclusory declarations are insufficient to raise a question of material fact. *See Davis v. New*

*York*, 316 F.3d 93, 100 (2d Cir. 2002). However, non-medical evidence that conveys, in detail, the substantially limiting nature of an impairment may be sufficient to survive summary judgment.

Here, the plaintiffs have presented sufficient evidence to create a genuine dispute of material fact as to whether A.R.'s ability to learn was substantially limited by her impairments. The district court concluded that the plaintiffs' testimony "does not explain how A.R.'s condition may have substantially limited a major life activity," *Rodriguez I*, 2013 WL 5592703, at *6, and that there was "no objective assessment or indication of the degree of any [e]ffect of A.R.'s impairments on her school work or learning ability such that it can reasonably be said that any limitation is substantial," *id.* at *8. This summary of the evidence fails "to resolve all ambiguities [or] draw all permissible factual inferences" in favor of the plaintiffs. *See Stone*, 118 F.3d at 99.

In reaching its conclusion, the district court did not note relevant deposition testimony from Ms. Rodriguez. For example, Ms. Rodriguez testified that A.R. was provided with an Individualized Education Plan ("IEP")[14] at school since summer 2009 and was classified as "OHI."[15] According to Ms. Rodriguez, A.R. had been diagnosed with autism at the beginning of 2009. As a result of her classification as OHI and the provisions of her IEP, A.R. received at her school "counsel[]ing, individual, group counsel[]ing, . . .

---

[14] "A state receiving federal funds under the [Individuals with Disabilities Education Act ('the IDEA'), 20 U.S.C. § 1400 *et seq.*] must provide disabled children with a free and appropriate public education . . . ." *R.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167, 174-75 (2d Cir. 2012). To ensure compliance, a school district must create an IEP for each qualifying child. *Id.* at 175. "The IEP is a written statement that sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives." *Id.* (internal quotation marks and citation omitted); *see also* 20 U.S.C. § 1414(d) (setting forth the information to be included in an IEP).

[15] "OHI" stands for "other health impairments" and is one of the categories used to define a "child with a disability" under the IDEA. *See* 20 U.S.C. § 1401(3)(A)(i). "Other health impairment means having limited strength, vitality, or alertness, including a heightened alertness to environmental stimuli, that results in limited alertness with respect to the educational environment, that . . . [a]dversely affects a child's educational performance." 34 C.F.R. § 300.8(c)(9)(ii).

[occupational therapy], speech and physical therapy . . . different testing accommodation[s], note takers, various things being read to her, extra time to complete tasks, extra time to take tests, [and] homework modifications." J.A. 165-66. Defendants argue that the receipt of special education services is not, by itself, determinative as to whether a child qualifies as disabled. We agree. A child receiving services under the IDEA "need not be 'substantially limit[ed]' in the major life activity of learning," so "one may therefore qualify as 'disabled' under the IDEA for purposes of that statute without demonstrating a 'substantially limit[ing]' impairment." *Ellenberg v. N.M. Military Inst.*, 572 F.3d 815, 821 (10th Cir. 2009) (alterations in original). Here, however, it is not just that A.R. qualified for an IEP that is dispositive in determining whether she qualifies as disabled. Rather, the nature of the specific services she requires shows the extent to which her impairments affect her ability to learn, and the additional evidence of how she has struggled notwithstanding her

IEP and the support she receives at school create a triable question of fact precluding summary judgment. *Cf. id.* at 821 n.6 (noting that the plaintiff "could have used her particular individualized education program to show specific evidence of substantial impairment, but did not").

Ms. Rodriguez also testified that A.R.'s petit mal seizures cause her to "blink[] off" for short periods of time. J.A. 177. For example, when experiencing these seizures, A.R. will stop mid-sentence, having forgotten what she was saying, or she will miss part of a program when watching television and not recall what happened. According to Ms. Rodriguez, A.R. began experiencing petit mal seizures in August or September 2010, when A.R. was entering fifth grade. Ms. Rodriguez testified that A.R. received special academic services throughout fifth grade, and that her grades in sixth grade – while initially good – "kept going considerably lower." J.A. 172. By the time A.R. reached seventh

grade in September 2012, she was still having petit mal seizures and still struggling with school. This testimony therefore also demonstrates the magnitude of A.R.'s impairment in the area of learning. *See* Hanneke M. de Boer et al., *The Global Burden and Stigma of Epilepsy*, 12 Epilepsy & Behav. 540, 542 (2008) (stating that "[o]ne major area of cognitive malfunctioning in people with epilepsy is memory impairment" and that frequent seizures can "impair learning of new information because of the amount of time the person is unaware of the environment").

In addition, on February 6, 2011 – during the time of the text message exchange with Aponte – A.R. had her first of two grand mal seizures. She was taken to the hospital and then suffered the second grand mal seizure on the way home. She was again taken to the hospital. Shortly following these seizures, A.R. was removed from her school because her medications were causing her to have "outbursts" and the school was "not able to provide her with a one-

on-one aide," making it "more of a safety risk to have her there."[16] J.A. 166-67. She was then home schooled by a tutor (provided by the school system), who had to "double [her] time because they could not even get through the stuff with her." J.A. 167-68. She did not return to school until the last week of June and did not finish her fifth grade course work until August 2011. Although the defendants are correct in observing that A.R.'s grand mal seizures have apparently not recurred since February 2011, it is the *impact* of her impairment, not its most severe physical manifestations, that must be "permanent or long term." *See Toyota Motor*, 534 U.S. at 198. Ms. Rodriguez testified that A.R. was continuing to struggle to keep up in school as late as September 2012. There is therefore at least a question of fact as to the long-term impact of the grand mal seizures alone and in combination with her other conditions on A.R.'s ability

---

[16] *See Sutton*, 527 U.S. at 482 ("[I]f a person is taking measures to correct for, or mitigate, a physical or mental impairment, the effects of those measures – both positive and negative – must be taken into account when judging whether that person is 'substantially limited' in a major life activity and thus 'disabled.'").

to learn. *Cf.* Joan K. Austin et al., *Does Academic Achievement in Children with Epilepsy Change over Time?*, 41 Developmental Med. & Child Neurology 473, 478 (1999) (finding no trend of improved academic achievement among children "whose seizure conditions changed from high to low severity," and hypothesizing that "[o]ne possible explanation for this finding . . . is that these children missed out on learning information during the period when their seizure conditions were severe and [they] were not able to catch up").

In addition to this evidence, the plaintiffs also submitted medical evidence to demonstrate the extent of A.R.'s limitations, including a May 2009 developmental-behavioral evaluation, a June 2009 occupational therapy initial evaluation, and progress notes and reports from A.R.'s pediatric neurologists in 2010 and 2011. The plaintiffs offered these documents in opposition to defendants' motion for summary judgment. The documents were cited in plaintiffs' opposition brief, quoted in plaintiffs' response to

defendants' Local Rule 56.1 statement, and presented as attachments to the declaration of plaintiffs' attorney, who attested that they are true and accurate copies, and were produced under a protective order for A.R.'s medical records.

The defendants first raised an objection to the admissibility of these records in their reply brief in support of their motion for summary judgment, which was filed on October 4, 2013. On October 7, 2013, the district court noted on the docket that the parties' cross-motions for summary judgment would be decided without oral argument. On October 10, 2013 – just six days after defendants first objected to the admissibility of the medical records – the district court issued its opinion in *Rodriguez I*, in which it found that the records were inadmissible because they were unauthenticated and there was no indication that they were complete and accurate copies of A.R.'s medical records. *See Rodriguez I*, 2013 WL 5592703, at *6. It therefore does not appear that the plaintiffs had an opportunity to

respond to the defendants' objections or to supplement the record with additional documentation to authenticate and certify the records prior to the district court's ruling. *See* Fed. R. Civ. P. 56(c)(2) advisory committee's note to 2010 amendment ("[A] party may object that material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence. The objection functions much as an objection at trial, adjusted for the pretrial setting. The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated."); *cf. H. Sand & Co. v. Airtemp Corp.*, 934 F.2d 450, 454 (2d Cir. 1991) (stating that Fed. R. Civ. P. 56 "does not . . . require that parties authenticate documents where [the non-offering party] did not challenge the authenticity of the documents").

Having reviewed these medical records, we note that their appearance, contents, and substance are what one would expect of such records and support plaintiffs' claim that they are what they

appear to be. *Cf.* Fed. R. Evid. 901(b)(4) (stating that the authentication requirement can be satisfied by "[t]he appearance, contents, substance, . . . or other distinctive characteristics of the item, taken together with all the circumstances"); *United States v. Pluta*, 176 F.3d 43, 49 (2d Cir. 1999) ("[T]he burden of authentication does not require the proponent of the evidence to . . . prove beyond any doubt that the evidence is what it purports to be. Rather, the standard for authentication, and hence for admissibility, is one of reasonable likelihood." (alteration in original) (internal quotation marks and citation omitted)); *United States v. Bagaric*, 706 F.2d 42, 67 (2d Cir. 1983) ("The requirement of authentication is satisfied by evidence sufficient to support a finding that the matter is what its proponent claims. This finding may be based entirely on circumstantial evidence, including [a]ppearance, contents, substance . . . and other distinctive characteristics of the writing." (alterations in original) (internal quotation marks and citations

omitted)), *abrogated on other grounds by Nat'l Org. for Women, Inc. v. Scheidler*, 510 U.S. 249 (1994). The record also indicates that these records were produced by the medical providers themselves. *See* Smyth Decl., App'x A, Tab 5 at 2 (facsimile transmittal page from eRiver Neurology); *id.*, App'x A, Tab 8 at 2 (HIPAA authorization signed by Ms. Rodriguez authorizing release of A.R.'s records to plaintiffs' counsel); *id.*, App'x A, Tab 9 at 2 (cover letter to plaintiffs' counsel describing photocopying fee from school district where A.R.'s evaluating occupational therapist was employed). These documents therefore seem like the type that likely could have been authenticated and certified, had plaintiffs had the opportunity to respond.

Moreover, although the district court stated that these records were "inadmissible," the court still considered them, reviewed them in some detail, and concluded that they were "insufficient to establish a medical condition that substantially limits one or more

major life activities." *Rodriguez I*, 2013 WL 5592703, at *6-8. Accordingly, although we conclude that the non-medical evidence discussed above is sufficient to raise a genuine dispute as to the extent of A.R.'s limitations, we will consider these medical records as well. *Cf. Sony Corp. v. Elm State Elecs., Inc.*, 800 F.2d 317, 320 (2d Cir. 1986) (describing the Second Circuit's "strong preference for resolution of disputes on their merits" and "preference for resolving doubts in favor of a trial on the merits"); *Cargill, Inc. v. Sears Petroleum & Transp. Corp.*, 334 F. Supp. 2d 197, 247 (N.D.N.Y. 2004) ("Because of the preference to have issues and claims decided on their merits, rather than on the basis of a procedural shortcoming, the exclusion of otherwise relevant evidence on technical grounds is generally not favored . . . .").

We find that the medical records submitted by the plaintiffs further support plaintiffs' claims of how severely A.R.'s

impairments affect her ability to learn.[17] In May 2009, at the recommendation of A.R.'s school, the Rodriguezes took A.R. to see pediatrician Dr. Monica R. Meyer for a developmental-behavioral evaluation. Dr. Meyer recorded the Rodriguezes' concern that A.R.'s "anxieties . . . have led to a plateauing in her school work and her no longer performing well in school." J.A. 250. She diagnosed A.R. as having "pervasive developmental disorder" and noted that this condition, along with A.R.'s anxiety, "impact[s] her life in general, her performance at school and her peer interactions." J.A. 254-55. Dr. Meyer found that "[a]t school, [A.R.] belongs in an integrated class with a special education teacher who has experience working with children on the autistic spectrum." J.A. 255. Dr. Meyer also recommended counseling, social skills training, occupational

---

[17] These records include progress notes from A.R.'s pediatric neurologists, Drs. Glenn Y. Castaneda and Faith Goring-Britton; a developmental-behavioral evaluation by Dr. Monica R. Meyer, a developmental-behavioral pediatrician; and an occupational therapy initial evaluation by Meg Simmons-Jackson, a licensed and registered occupational therapist.

therapy, and "accommodations that lessen the impact of [A.R.'s] anxiety on her academic performance." *Id.*

An occupational therapy initial evaluation conducted by A.R.'s school system in 2009 following A.R.'s autism diagnosis found that she had "difficulty registering visual and movement input" and "misses written/demonstrated directions." J.A. 260. The evaluation also noted that A.R. "requires more external supports than her peers to participate in learning," "is currently not registering input that will help her attend to the task at hand," "[has] [t]olerance within the learning environment [that] is less than that of her peers," and "[has] [a]vailability for learning within the learning environment [that] is less than that of her peers." J.A. 259.

In November 2010, shortly before the events of February 2011, pediatric neurologist Dr. Glenn Castaneda diagnosed and treated A.R.'s epilepsy. His notes confirm that the Rodriguezes observed

that A.R.'s petit mal seizures were "beginning to affect her school work as her grades [were] deteriorating." J.A. 247.

Finally, Dr. Castaneda's records from March 2011 state that Ms. Rodriguez reported that A.R.'s conditions were "causing a lot of distress for [A.R.] . . . and [that] she ha[d] been off of school for at least a couple of weeks." J.A. 241. At the time of Ms. Rodriguez's deposition in September 2012, A.R. was in her first week of seventh grade, and she was still experiencing petit mal seizures and was "having struggles [with school] already." J.A. 172, 176-77.

Whether just considering the non-medical evidence, or also considering this medical evidence, the evidence as to the severity of A.R.'s learning limitations is sufficient to survive summary judgment. A jury could reasonably infer from the extensive educational support A.R. receives that she is significantly limited in her ability to independently register and process information, pay attention to educators, take notes, read, and complete her

homework. *See Gummo v. Vill. of Depew, N.Y.*, 75 F.3d 98, 107 (2d Cir. 1996) ("If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper."). These skills are fundamental to learning, as are the ability to remember information and to follow written or demonstrated directions — abilities that may also be substantially limited by A.R.'s petit mal seizures and autism, according to plaintiffs' evidence. Where these skills are limited, it follows that A.R.'s ability to learn may be substantially limited. *See Emory v. AstraZeneca Pharm. LP*, 401 F.3d 174, 181-82 (3d Cir. 2005) (reversing a grant of summary judgment because evidence that plaintiff's "limitations interfere with his ability to read and process information, as well as basic math skills or the filling out of paperwork," was sufficient to create a genuine issue as to whether he was substantially limited in the major life activity of learning); *cf.*

*Branham v. Snow*, 392 F.3d 896, 903-04 (7th Cir. 2004) (holding that a reasonable juror could find the plaintiff substantially limited in the activity of eating based on his diabetes, his limitations after receiving treatment, and the side effects of that treatment). Significantly, this conclusion is supported by the fact that, despite the extra help A.R. receives at school, her grades began deteriorating in fifth grade and she has continued to struggle in sixth and seventh grade. *See Sutton*, 527 U.S. at 482. Drawing all permissible inferences in favor of the plaintiffs, they have presented sufficient evidence at this stage of the litigation to create a genuine dispute as to whether A.R.'s ability to learn is substantially limited.

**B. "Regarded as" Disabled Under Section 3602(h)(3)**

Plaintiffs also challenge the district court's conclusion that "there is insufficient evidence upon which a fair minded trier of fact could reasonably conclude that Aponte regarded A.R. as having a handicap." *Rodriguez I*, 2013 WL 5592703, at *9. According to the regulations issued by the Department of Housing and Urban

Development, one is regarded as having an impairment if, *inter alia*, she "[h]as a physical or mental impairment that does not substantially limit one or more major life activities but that is treated by another person as constituting such a limitation." 24 C.F.R. § 100.201(d)(1). Prior to the 2008 enactment of the ADAAA, the regulations implementing the ADA contained a substantially identical provision, which we held required a plaintiff to "show that defendants perceived [the plaintiff's] impairment as substantially limiting the exercise of a major life activity." *Reeves v. Johnson Controls World Servs., Inc.*, 140 F.3d 144, 153 (2d Cir. 1998).[18]

---

[18] Following the enactment of the ADAAA,

> [a]n individual meets the requirement of "being regarded as having such an impairment" [under the ADA] if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity.

"Proving that a[] [plaintiff] is regarded as disabled . . . is a question embedded almost entirely in the [defendant's] subjective state of mind." *Ross v. Campbell Soup Co.*, 237 F.3d 701, 709 (6th Cir. 2001).

> This Court has consistently held where subjective issues regarding a litigant's state of mind . . . are squarely implicated, summary judgment would appear to be inappropriate and a trial indispensable. . . . Furthermore, a sojourn into an adherent's mind-set will inevitably trigger myriad factual inferences, as to which reasonable persons might differ in their resolution. Traditionally, this function has been entrusted to the jury.

*Patrick v. LeFevre*, 745 F.2d 153, 159 (2d Cir. 1984) (citations omitted).

The first step of our analysis is to determine the major life activity at issue. *Cf. Reeves*, 140 F.3d at 153-54. The plaintiffs primarily contend that Aponte's text messages show that she perceived A.R.'s epilepsy as substantially limiting her in the major

42 U.S.C. § 12102(3)(A); *see also Hilton v. Wright*, 673 F.3d 120, 128-29 (2d Cir. 2012) (per curiam) (discussing the amendment to the ADA's "regarded as" provision). As noted above, the FHA was not similarly amended.

life activity of obtaining housing. They also argue that she regarded A.R. as substantially limited in her ability to learn.

This Court has not determined whether "obtaining housing" is a major life activity, but the Fourth Circuit has held that it is. *United States v. S. Mgmt. Corp.*, 955 F.2d 914, 919 (4th Cir. 1992). We agree. "Major life activities means functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 24 C.F.R. § 100.201(b). But this list is "not exclusive." *Reeves*, 140 F.3d at 150; *see also Bartlett v. N.Y. State Bd. of Law Exam'rs*, 226 F.3d 69, 79-80 (2d Cir. 2000). Major life activities are "those activities that are of central importance to daily life," *Toyota Motor*, 534 U.S. at 197, including reading, *Bartlett*, 226 F.3d at 80, and interacting with others, *Jacques v. DiMarzio, Inc.*, 386 F.3d 192, 202-04 (2d Cir. 2004). On the other end of the spectrum are those activities that are "insufficiently fundamental," such as performing housework and shopping. *Colwell v. Suffolk Cnty. Police*

*Dep't*, 158 F.3d 635, 642-43 (2d Cir. 1998). The ability to obtain shelter is among the most basic of human needs and thus is a "major life activity" for purposes of the FHA. We note that a person is not substantially limited in the major life activity of obtaining housing simply because she is unable to, or regarded as unable to, live in a particular dwelling. Rather, a person is substantially limited if, due to her impairment, she cannot live or is regarded as unable to live in a broad class of housing that would otherwise be accessible to her. *Cf. Sutton*, 527 U.S. at 491-92.

We now turn to whether the plaintiffs' evidence is sufficient for a reasonable juror to conclude that Aponte perceived A.R.'s impairments as substantially limiting her in the activities of learning or obtaining housing. The district court concluded that "the only limitations expressed" by these messages were with respect to the ability of an ambulance to reach the property, "not whether A.R.

was limited with respect to a major life activity." *Rodriguez I*, 2013 WL 5592703, at *9. We disagree.

First, there is sufficient evidence to create a genuine dispute as to whether Aponte perceived A.R. as substantially limited in her ability to learn. Aponte knew from Drost – the Rodriguezes' neighbor and A.R.'s aide at school – that A.R. was autistic and received special education services at school. Aponte learned from Ms. Rodriguez, and likely from Morelli as well, that A.R. is epileptic. Although Aponte's statement in her text messages that "[t]he prospective new owner is very concerned about continuing your lease with you Childs medical situation and will probably not want to rent to you," J.A. 232, does not illuminate what medical condition is at issue or why she thought the condition would be of concern, answering those questions and determining Aponte's mental state should be left to the jury. *See LeFevre*, 745 F.2d at 159.

Second, there is also evidence that Aponte perceived A.R. as substantially limited in her ability to obtain housing. Aponte wrote in her text messages to Ms. Rodriguez:

- "The new owner has decided not to continue to rent to you because your daughter should be in a more convenient location to medical treatment[.]" J.A. 233.

- "The new owner is concerned by your statement that emergency vehicles cannot reach you should your daughter be at risk." *Id*.

- **"**When all these concerns came up about your daughter being seriously ill and emergency vehicles not being able to get to her! That is of major concern as to liability which you raised!!" *Id*. at 235.

Arguably, Aponte expresses through these messages a belief that, because of her epilepsy, A.R. could only live close to facilities providing medical treatment. If true, this could certainly be a perceived substantial limitation on A.R.'s ability to obtain housing. By including in the definition of "handicap" "not only those who are actually physically impaired, but also those who are regarded as

impaired . . . , Congress acknowledged that society's accumulated myths and fears about disability and disease are as handicapping as are the physical limitations that flow from actual impairment." *Sch. Bd. of Nassau Cnty., Fla. v. Arline*, 480 U.S. 273, 284 (1987) (referring to section 504 of the Rehabilitation Act of 1973, Pub. L. No. 93-112, 87 Stat. 355 (1973) (codified as amended at 29 U.S.C. § 701 *et seq.*)). The 1988 Amendments to the FHA, which extended coverage of the Act to disabled individuals, were specifically aimed at rejecting "[g]eneralized perceptions about disabilities and unfounded speculations about threats to safety . . . as grounds to justify exclusion." H.R. Rep. No. 100-711, at 18 (1988), *reprinted in* 1988 U.S.C.C.A.N. 2173, 2179. A conclusion that one with epilepsy can only safely live in a property close to medical care is the sort of "unfounded speculation" about a disability against which the FHA is designed to protect, and any denial of housing resulting from such speculation would be "as handicapping as . . . the physical

limitations that flow from [A.R.'s] actual impairment." *Arline*, 480 U.S. at 284.

Aponte's text messages can also be read to suggest that she believed the new owner would find A.R.'s medical needs, in her words, a "liability" and a "risk." In extending coverage to those individuals who are "regarded as" having a physical or mental disability, Congress was concerned with impairments that "might not diminish a person's physical or mental capabilities, but could nevertheless substantially limit that person[] . . . as a result of the negative reactions of others to the impairment." *Id.* at 282-83 & n.10. One reasonable interpretation of Aponte's texts is that she believed A.R.'s impairment made her an undesirable tenant, restricted in her ability to obtain housing because property owners would not wish to rent to her.[19]

---

[19] As mentioned above, any such concerns would have originated with Aponte herself, as she had no basis to believe that the prospective purchaser of the property felt this way.

Because there is sufficient evidence to create a genuine dispute as to whether A.R. qualifies as disabled for purposes of the FHA, we vacate the district court's grant of summary judgment on plaintiffs' claims under 42 U.S.C. § 3604(f) and remand.[20]

**C.      Subsection 3604(d)**

The district court also dismissed the plaintiffs' subsection 3604(d) claim. The court found that

> for the § 3604(c) claim, Plaintiffs must demonstrate that an ordinary listener would believe that, in light of all the circumstances, Aponte's statements indicated a preference, limitation or discrimination based on "handicap," as defined by statute. Similarly, for the § 3604(d) claim, Plaintiffs must demonstrate that Aponte represented that the apartment was not for rent because of "handicap," as defined by the statute.

---

[20] Defendants urge that we affirm the district court on the ground that Aponte's alleged conduct was insufficient "to qualify as rendering a house unavailable and/or imposing discriminatory terms and conditions for continued renting" under 42 U.S.C. § 3604(f)(1) and (2).  As the district court did not reach this question, we decline to address it in the first instance on appeal. *See Hartford Courant Co. v. Pellegrino*, 380 F.3d 83, 90 (2d Cir. 2004) ("In general, we refrain from analyzing issues not decided below . . . .").

*Rodriguez II*, 2013 WL 6058577, at *3. The court – discussing and dismissing both claims together – concluded that Aponte's statements were not "based on handicap" as defined in the FHA because there was insufficient evidence (1) that A.R. was disabled within the meaning of the FHA or (2) that "Aponte expressed a preference, limitations, or discrimination against disabled persons generally or persons whom she regarded as disabled or had a record of disability." *Id.* In doing so, the district court conflated subsection (c) with subsection (d). This was also error.

Subsection (d) makes it unlawful "[t]o represent to any person *because of . . . handicap . . .* that any dwelling is not available for inspection, sale or rental when such dwelling is in fact so available." 42 U.S.C. § 3604(d) (emphasis added). The italicized language mirrors subsection 3604(f), which prohibits discrimination "because of a handicap." *Id.* § 3604(f). It is *not* the same as subsection 3604(c), which prohibits statements that "*indicate*[] any preference . . . *based*

-56-

*on*" disability. *See Ragin I*, 923 F.2d at 999 (relying on the "critical . . . verb 'indicates'" to support adoption of the "ordinary reader" standard). It is the "actually disabled" or "regarded as disabled" standards – not the ordinary listener standard – that is applied to subsection 3604(d). Because the "ordinary listener" standard does not apply and there is sufficient evidence to show that A.R. is disabled, we also vacate and remand the district court's dismissal of plaintiffs' subsection 3604(d) claim.

**IV.   Subsection 3604(c)**

In dismissing plaintiffs' claim under subsection 3604(c), the district court held on reconsideration that an "ordinary listener" could not have understood Aponte's statements concerning A.R. to indicate a preference based on disability. The court based its determination on the fact that Aponte's statements were aimed exclusively at A.R., and that the court had already determined that the evidence was insufficient to establish that A.R. was in fact

disabled under the FHA definition. *Rodriguez II*, 2013 WL 6058577, at *3. However, regardless of whether A.R. is disabled under the FHA definition, the "ordinary listener" could understand Aponte's statements to A.R.'s mother as classifying A.R. as such and expressing discrimination on that basis. For the reasons that follow, we hold that section 3604(c) can be violated by statements targeted at an individual that convey to an ordinary listener that the individual is disabled. In other words, it is not determinative that the individual being addressed is or is not disabled under the FHA; what matters is whether the ordinary listener would understand the statements as considering her as such and expressing discrimination or a preference against her on that basis.[21]

---

[21] This analysis of our "ordinary listener" standard is necessitated by the unique circumstances of a case alleging discriminatory statements targeted *at an individual* based on *disability*. While the "ordinary listener" standard is well established in the context of racial discrimination, disability is often a much more contested classification that requires a fact intensive, case-by-case inquiry. *See Toyota Motor*, 534 U.S. at 198-99. The determination becomes even more complicated when applying the "ordinary listener" standard to statements made directly to an individual.

This approach is supported by our decisions that have emphasized that subsection 3604(c) "'protect[s] against [the] psychic injury' caused by discriminatory statements made in connection with the housing market." *United States v. Space Hunters, Inc.*, 429 F.3d 416, 424-25 (2d Cir. 2005) (alterations in original) (quoting Robert G. Schwemm, *Discriminatory Housing Statements and § 3604(c): A New Look at the Fair Housing Act's Most Intriguing Provision*, 29 Fordham Urb. L.J. 187, 250 (2001)); *see also* Schwemm, *supra*, at 249 (noting that courts have ruled that section 3604(c)'s goals include reducing the market-limiting effect of discriminatory statements and protecting "home seekers from suffering insult, emotional distress, and other intangible injuries").

We believe this approach alleviates the difficulty in applying section 3602(h)'s definition of "handicap . . . with respect to a person" to subsection 3604(c), the only prohibition in section 3604 that does not refer to a "person" or "buyer or renter." In *Toyota*

*Motor*, the Supreme Court pointed out that the "the [ADA] defines 'disability' with respect to an individual." *Toyota Motor*, 534 U.S. at 198. The same is true of the FHA's definition of handicap. *See* 42 U.S.C. § 3602(h). According to the Court, this language in the ADA "ma[de] clear that Congress intended the existence of a disability to be determined in ... a case-by-case manner," requiring "[a]n individualized assessment of the effect of an impairment." *Toyota Motor*, 534 U.S. at 198-99. The *Toyota Motor* Court, however, was considering a pre-amendment version of a section of the ADA that prohibited "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified *individual with a disability* who is an applicant or employee . . . ." ADA, § 102(b)(5)(A), 104 Stat. at 332 (emphasis added). In referring to an "individual," this provision of the pre-amendment ADA is similar to 42 U.S.C. § 3604(a)-(b), (d)-(f), all of which refer to a "person" or "buyer or renter." But subsection 3604(c) of the FHA – as noted

above – is different. Subsection 3604(c) does not refer to attributing a disability to a particular person, making the definition of "handicap . . . *with respect to a person*" and *Toyota*'s individualized analysis inapt. Indeed, a statement implicating subsection 3604(c) need not be targeted at a single, identifiable individual at all. Thus, holding that a statement, even when targeted at a non-disabled individual, can still violate subsection 3604(c) – as long as it conveys, to the ordinary listener, a preference against those who are disabled as defined by the FHA – accomplishes the goal of subsection 3604(c).

This view of subsection 3604(c) also recognizes that subsection 3604(c) "prohibits all ads that indicate a [disallowed] . . . preference to an ordinary reader whatever the advertiser's intent." *Ragin I*, 923 F.2d at 1000; *cf. Soules v. U.S. Dep't of Hous. & Urban Dev.*, 967 F.2d 817, 825 (2d Cir. 1992) ("[F]actfinders may examine [the speaker's] intent, not because a lack of design constitutes an affirmative defense to an FHA violation, but because it helps determine the

manner in which a statement was made and the way an ordinary listener would have interpreted it."). It would contradict the language of subsection 3604(c) to hold that what matters is whether a person was "regarded as" disabled by the speaker, an inquiry that depends on the speaker's state of mind. *See Reeves*, 140 F.3d at 153. Under subsection 3604(c), the speaker's subjective belief is not determinative. What matters is whether the challenged statements *convey* a prohibited preference or discrimination to the ordinary listener.[22]

In the end, the "touchstone" of the inquiry is the message conveyed. *Ragin I*, 923 F.2d at 1000. Aponte responded to learning that A.R. had autism and epileptic seizures with a series of text messages stating concerns about renting to the Rodriguez family, including fear that their tenancy would be a "liability." The district

---

[22] This discussion addresses the particular issues raised by the "regarded as" definition of disability under subsection 3602(h)(3), but a statement directed at an individual can also violate subsection 3604(c) when it conveys to the ordinary listener that the individual is actually disabled under subsection 3602(h)(1).

court acknowledged that Aponte's "statements superficially appear to be discriminatory on their face because they indicate a desire not to rent to Plaintiffs on account of A.R.'s 'illness,' 'medical condition,' 'situation,' or proximity to medical treatment." *Rodriguez II*, 2013 WL 6058577, at *3. The ordinary listener, who "is neither the most suspicious nor the most insensitive of our citizenry," *Ragin I*, 923 F.2d at 1002, very well could have interpreted these messages as stating a desire not to rent to anyone with such limitations. This preference could cover many people who qualify as disabled under the FHA, and thus Aponte's statements conveying this preference would violate subsection 3604(c).

**CONCLUSION**

We hold that the district court erred in granting defendants summary judgment because there is sufficient evidence that A.R. is disabled under the FHA. Furthermore, we hold that the "ordinary listener" standard is not applicable to claims under 42 U.S.C. §

3604(d). Therefore, this claim also survives summary judgment based on the evidence that A.R. was either actually disabled or regarded as such. Finally, we hold that statements directed at an individual may violate the FHA's prohibition against statements that indicate a preference or discrimination based on handicap, 42 U.S.C. § 3604(c), even if that individual is not disabled under the FHA. Here, the ordinary listener could understand Aponte's statements as classifying A.R. as disabled under the FHA and indicating discrimination or a preference against her on that basis.

Accordingly, we **VACATE** the judgment of the district court and **REMAND**.