343 Conn. 31 APRIL, 2022 31

Lopez *v.* William Raveis Real Estate, Inc.

CARMEN LOPEZ *v.* WILLIAM RAVEIS
REAL ESTATE, INC., ET AL.
(SC 20574)

Robinson, C. J., and D'Auria, Mullins, Ecker and Keller, Js.

*Syllabus*

Pursuant to statute (§ 46a-64c (a) (1)), it is a discriminatory practice "[t]o refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of . . . lawful source of income . . . ."

Pursuant further to statute (§ 46a-64c (a) (3)), it is a discriminatory practice "[t]o make, print or publish, or cause to be made, printed or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on . . . lawful source of income . . . or an intention to make any such preference, limitation or discrimination."

The plaintiff sought to recover damages for alleged housing discrimination in connection with certain statements that the defendant H, a real estate salesperson, made regarding the plaintiff's participation in the Section 8 Housing Choice Voucher Program. H served as an independent contractor for the named defendant, R Co., a real estate broker. R Co., through H, entered into a listing contract with the defendant V for the exclusive right to lease an apartment owned by V and his wife. Thereafter, the plaintiff, through her real estate agent, B, submitted an application and offer to lease the apartment. After receiving the documents and speaking with V, who wanted the apartment rented by April 1, 2017, H notified B that they were "all set" for a lease commencing on that date. B then sent H blank section 8 paperwork to accompany the plaintiff's application. H and B then proceeded to exchange e-mails and text messages, in which H repeatedly indicated that she was not aware that the plaintiff would be using a section 8 voucher, that she would have to speak to V, that the decision was up to V, and that she was not sure if V would want to wait for the section 8 approval process. H eventually texted B that V had received a competing offer for the apartment, and, several hours later, H texted B that V had accepted the competing offer. The plaintiff alleged that H violated § 46a-64c (a) (1) and (3) by denying her the opportunity to rent the apartment on the basis of her lawful source of income and by making statements that indicated any preference, limitation, or discrimination on the basis of lawful source of income, and, in addition, that R Co., V, and V's wife were vicariously liable for H's statements. After a trial to the court, the trial court rendered judgment for the defendants, concluding that the plaintiff had failed to prove unlawful discrimination. Specifically, with respect to the plaintiff's

Lopez *v.* William Raveis Real Estate, Inc.

claim under § 46a-64c (a) (3), the court determined that H's statements would not convey to an ordinary listener a rejection of or otherwise disfavor a section 8 tenancy. On the plaintiff's appeal from the trial court's judgment, *held*:

1. The trial court incorrectly concluded that H's statements did not indicate any preference, limitation, or discrimination based on lawful source of income, in violation of § 46a-64c (a) (3):

a. Contrary to the plaintiff's claim, the trial court properly applied the ordinary listener standard in determining whether H's statements conveyed an impermissibly discriminatory preference: this court considered the statute's legislative history, as well as cases interpreting federal fair housing laws and the federal counterpart to § 46a-64c (a) (3), in particular, and concluded that, when a notice, statement, or advertisement that allegedly violates § 46a-64c (a) (3) is plainly discriminatory on its face, courts need not examine the surrounding context or the speaker's intent to determine whether the statement indicates any impermissible preference, limitation, or discrimination to the ordinary listener, but, when such a notice, statement, or advertisement is not discriminatory on its face, courts may consider context and the intent of the speaker to aid in determining the way an ordinary listener would have interpreted it; in the present case, the trial court apparently concluded that H's statements were not facially discriminatory, and, because this court agreed with that determination, it was not improper for the trial court to consider the context of H's statements in determining whether they indicated any preference, limitation, or discrimination based on lawful source of income.

b. The trial court's conclusion that H's statements would not have conveyed to an ordinary listener an impermissible preference with respect to lawful source of income was clearly erroneous: there was overwhelming evidence in the trial court's factual findings that supported the plaintiff's housing discrimination claim, as, after indicating that the plaintiff was "all set," H stated four separate times that she was not aware that the plaintiff intended to use a section 8 voucher to pay rent and that she was not sure whether V would want to wait, H had already made two of those statements before receiving the competing offer, meaning that she could not reasonably rely on the competing offer to explain her earlier statements, and, in context, H's statements could not reasonably be understood to mean anything other than that the plaintiff's intention to use her section 8 voucher to pay rent would be an obstacle to her lease application; moreover, the trial court's conclusion in favor of H undercut the broad protections afforded by § 46a-64c (a) (3), which is intended to protect against the psychic injury caused by discriminatory statements, especially in light of this state's public policy that landlords may not discriminate against housing applicants who use section 8 assistance and the legislature's manifest intent to afford low income families access to the rental housing market; in the present case, the plaintiff

Lopez *v.* William Raveis Real Estate, Inc.

indicated that she was able to satisfy V's interest in an April 1, 2017 tenancy, any preference to avoid the administrative process the section 8 program involved was an impermissible consideration under both subdivisions (1) and (3) of § 46a-64c (a), and this court was left with the definite and firm conviction that the trial court's conclusion that H's statements did not express a preference with respect to, or discriminate on the basis of, the plaintiff's lawful source of income was not simply an alternative yet permissible view of the evidence.

2. Although the trial court did not address the issue of vicarious liability, this court determined, as a matter of law, that R Co. was vicariously liable for H's statements but that V and his wife were not, and, accordingly, this court reversed the judgment of the trial court and remanded the case with direction to render judgment for the plaintiff as to liability against H and R Co. under § 46a-64c (a) (3) and for further proceedings to determine, inter alia, the damages to which the plaintiff was entitled: the parties stipulated, and the trial court found, that R Co. is a real estate broker and that H is R Co.'s independent contractor, and, because H acted on behalf of R Co. when she executed the listing contract with V and her statements were made in furtherance of that contract, R Co. was liable to the same extent as if H were its employee pursuant to the statute (§ 20-312a) governing the vicarious liability of real estate brokers; moreover, although V and his wife had an independent contractor relationship with H, there was no evidence that the listing contract gave V any control over H, and, in the absence of any exception to the general rule that employers are not liable for the torts of their independent contractors, V and his wife were not vicariously liable for any of H's statements.

Argued October 14, 2021—officially released April 19, 2022

*Procedural History*

Action to recover damages for alleged housing discrimination, and for other relief, brought to the Superior Court in the judicial district of Danbury, where the case was tried to the court, *Kowalski, J.*; judgment for the defendants, from which the plaintiff appealed. *Reversed in part*; *further proceedings*.

*Jeffrey Gentes*, for the appellant (plaintiff).

*Tracey Lane Russo*, for the appellees (named defendant et al.).

*Joseph P. Sargent*, for the appellees (defendant Anthony Vaccaro et al.).

Lopez *v.* William Raveis Real Estate, Inc.

*Opinion*

ROBINSON, C. J. In this appeal, we consider the standard for determining whether a statement made in connection with the sale or rental of a dwelling violates General Statutes § 46a-64c (a) (3)[1] by indicating a "preference, limitation, or discrimination," or an "intention to make any such preference, limitation or discrimination," on the basis of an individual's "lawful source of income . . . ." The plaintiff, Carmen Lopez, appeals[2] from the judgment of the trial court rendered in favor of the defendants, William Raveis Real Estate, Inc. (Raveis), Sarah Henry, a licensed real estate salesperson, and Anthony Vaccaro and Eve Vaccaro,[3] in this action alleging housing discrimination in violation of § 46a-64c (a). On appeal, the plaintiff claims that the trial court, in considering whether Henry violated § 46a-64c (a) (3) by making certain statements in the course of renting an apartment owned by the Vaccaros, improp-

_____

[1] General Statutes § 46a-64c (a) provides in relevant part: "It shall be a discriminatory practice in violation of this section:

"(1) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, creed, color, national origin, ancestry, sex, gender identity or expression, marital status, age, lawful source of income, familial status or status as a veteran.

\* \* \*

"(3) To make, print or publish, or cause to be made, printed or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, creed, color, national origin, ancestry, sex, gender identity or expression, marital status, age, lawful source of income, familial status, learning disability, physical or mental disability or status as a veteran, or an intention to make any such preference, limitation or discrimination. . . ."

[2] The plaintiff appealed from the judgment of the trial court to the Appellate Court, and we subsequently granted the plaintiff's motion to transfer this appeal from the Appellate Court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-2.

[3] For purposes of convenience, we refer to the defendants individually as appropriate. Consistent with the trial court's memorandum of decision, we refer to Anthony Vaccaro individually as "Vaccaro" and to Eve Vaccaro by her full name.

Lopez *v.* William Raveis Real Estate, Inc.

erly considered whether Henry had the subjective intent to discriminate on the basis of lawful source of income when she made those statements. The plaintiff specifically contends that she is entitled to judgment in her favor because (1) Henry's statements were facially discriminatory, rendering her subjective intent irrelevant as a matter of law, and (2) even if we were to conclude that Henry's statements were not facially discriminatory, the trial court nevertheless incorrectly determined that the statements, considered in context, did not convey an impermissible preference. We conclude that, although the trial court applied the proper legal standard in considering the plaintiff's claims under § 46a-64c (a) (3), its ultimate conclusion as to liability on the facts of this case was clearly erroneous with respect to Henry. Accordingly, we reverse in part the judgment of the trial court.

The record reveals the following relevant facts, as found by the trial court, and procedural history. At all relevant times, the Vaccaros owned a two family home located at 5 Prince Street in Danbury. On January 28, 2017, Vaccaro entered into an exclusive right to lease listing contract with Raveis, through its authorized representative, Henry, to lease a rental apartment located in the two family home (rental apartment). Henry is a real estate salesperson who is affiliated with Raveis, a real estate broker, pursuant to an independent contractor agreement. Vaccaro informed Henry that he wanted to ensure a new tenancy was in place for the rental apartment by April 1, 2017. Henry listed the rental apartment on the multiple listing service database, and, on March 9, the plaintiff, through her real estate agent, Sarah Becker, submitted to Henry an application and offer to lease the rental apartment. Henry received the documents on March 11, and, despite the plaintiff's having left blank portions of the offer to lease,[4] Henry

---

[4] The trial court found the following facts with respect to the plaintiff's offer to lease: "The offer to lease identified [the plaintiff] as the tenant,

Lopez *v.* William Raveis Real Estate, Inc.

forwarded the offer to Vaccaro on March 12. The next day, March 13, following a phone call with Vaccaro, Henry e-mailed Becker: "[A]ll set for April 1st. I will get the lease over to you. [It's] one month rent and one month security."

Later on March 13, Becker sent Henry blank paper-work for the Section 8 Housing Choice Voucher Program (section 8) to accompany the plaintiff's application to lease the rental apartment. After Henry received the section 8 documents on March 15, the following conver-sation occurred:

At 8:29 a.m., Henry e-mailed Becker: "*I wasn't aware that this was a* [*s*]*ection 8 tenant.* I have to speak with [Vaccaro] today. [He] is looking for a security deposit for this rental . . . . I will give you a call later today."

At 9:46 a.m., Becker e-mailed Henry: "To whom should [the] check be made out . . . . I can be there for [the] housing inspection if you like, but [I] will need access to [the] basement. It's oddly one of the best parts of [my] working with housing—free inspections. I had a state paid tenant in one of my buildings for [more than eight] years (not [section] 8 but similar), the direct deposit payments and yearly inspections were great really—that agency monitored the condition of the apartment, and they kept a paper trail and photos. No disagreements over who did what to a place, plus I

Prince Street as the premises, a lease term starting on April 1, 2017, ending '[one] year, may renew,' and a lease price of $1500 per month, but left a blank where it would have been indicated that an initial deposit was tendered with the offer. There were other blanks that were not filled in on the offer to lease, including two consecutive lines that were left blank, as follows:

"Security Deposit: Payable to Landlord or Landlord's Agent upon Signing of Lease: $ _____

"Additional Rent: Payable to Landlord or Landlord's Agent upon Signing of Lease: $ _____

"Although these lines were left blank, the words 'AS REQUESTED' were handwritten next to the additional rent line. . . . The offer to lease further provided that it would expire at midnight 'ASAP' if not accepted by all parties and identified as a contingency 'kitchen sink faucet leaking, needs repair.' "

Lopez *v.* William Raveis Real Estate, Inc.

knew I'd get paid [which made it] easier to sleep at night. Plus to get a voucher the state has already checked out the tenant financially and their background, so that is a huge benefit to a landlord as well. Win-win. [Vaccaro] hasn't had anyone with voucher assistance before? You can let him know that most of the rent will come from the tenant, and a part from the state via direct deposit, and other than that it's pretty normal. Let me know how I can help. . . . Will need to get paperwork in ASAP so [we] can have [the] place inspected fast to meet [the] April 1 start date. Usually a place may fail the first time on a stuck/broken window or no [ground fault circuit interrupter (GFCI)] outlets, basic safety issues that should be in place for any tenant, and then passes on [the] second trip. If [the] windows function OK and [there are GFCI] outlets by [the] sinks, [it] should be in good shape, place looks nice.''

At 10:41 a.m., Henry texted Becker: ''Good morning *I was not aware of the [s]ection 8 when I spoke with you I'm not sure [Vaccaro] would want to wait. I know it takes a couple of weeks for the process and he wants to [rent] it by April 1st* I will speak with him today and let you know thanks.'' (Emphasis added.)

At 12:31 p.m., Henry texted Becker: ''I will speak with [Vaccaro] later today to make a decision about the rental.''

At 1:36 p.m., Henry texted Becker: ''*You did not inform me of section 8 when I spoke with you about the offer. I have to present that to [Vaccaro]. [I'm] not sure if [he] wants to [wait] through the process.* It is up to my client. We do not have a signed offer yet.'' (Emphasis added.)

At 1:50 p.m., Henry texted Becker: ''[Vaccaro] has another offer he's also looking at we do not have an offer without a signed lease. *You were not upfront with me with [s]ection 8 and I didn't [present it] to [Vaccaro]*

Lopez *v.* William Raveis Real Estate, Inc.

*that way as well. It's up to* [*Vaccaro*] *what he would like to do with the offers as well as the waiting.* I will get back to you tonight thank you.'' (Emphasis added.)

At 1:52 p.m., Becker texted Henry: ''It is not necessary to identify [my] client as having a voucher to all places she applies to, I respect her privacy, only that income is sufficient.''

At 2:23 p.m., Henry texted Becker: ''Yes, it is necessary by law. *It needs to be on the offer if paying from a* [*third*] *party.* [Vaccaro] will let me know tonight either way thanks.'' (Emphasis added.)

At 7:09 p.m., Henry texted Becker: ''Hi, [Vaccaro] has decided to go with the other offer, [s]orry.''

As reflected in the conversation, Henry received a second offer to lease on behalf of Everton Thompson and Saudia Dyer (Thompson and Dyer offer) on March 15, 2107, at 11:37 a.m. The Thompson and Dyer offer was accompanied by a completed rental application. It also proposed a lease term beginning on March 15, 2017, and ending on February 28, 2018, a lease price of $1500 per month, and a security deposit of $3000, and identified no contingencies. Vaccaro instructed Henry to accept the Thompson and Dyer offer and had a fully executed lease for the rental apartment by March 18.

The plaintiff subsequently brought this action for, inter alia, compensatory damages, punitive damages, and declaratory and injunctive relief, claiming that the defendants violated § 46a-64c (a) by (1) denying her the opportunity to rent property on the basis of her lawful source of income,[5] in violation of subdivision (1) of

_____

[5] By way of background, General Statutes § 46a-63 (3) defines ''lawful source of income'' as ''income derived from Social Security, supplemental security income, *housing assistance,* child support, alimony or public or state-administered general assistance.'' (Emphasis added.) ''[T]he lawful sources of income protected from discrimination by § 46a-64c include 'section 8 rental subsidies as a form of housing assistance.' '' *Commission on Human Rights & Opportunities* v. *Sullivan Associates,* 250 Conn. 763, 775, 739 A.2d 238 (1999).

Lopez *v.* William Raveis Real Estate, Inc.

§ 46a-64c (a), and (2) making a statement with respect to the rental of a dwelling that indicated a preference, limitation, or discrimination on the basis of lawful source of income, in violation of subdivision (3) of § 46a-64c (a). The case was tried to the court over four days. The trial court issued a memorandum of decision and rendered judgment in favor of the defendants, concluding that the plaintiff failed to prove that the defendants had discriminated against her on the basis of her lawful source of income in light of Henry's statements. Given its conclusion as to Henry's liability, the trial court also declined to reach the plaintiff's derivative claims against Raveis and the Vaccaros.

Subsequently, the plaintiff filed a motion for reargument and reconsideration on the grounds that the trial court either failed to analyze her § 46a-64c (a) (3) claims or improperly analyzed those claims under the mixed motive analysis applicable to § 46a-64c (a) (1) claims. The trial court granted the plaintiff's motion and issued an addendum to its memorandum of decision, further explaining its judgment in favor of the defendants on the plaintiff's § 46a-64c (a) (3) claims. Specifically, the trial court stated in that addendum that it "must determine whether Henry's statements convey a preference against Lopez to an ordinary listener, hearing the statements in context." Applying that standard, the trial court ultimately concluded that Henry's statements did "not convey a rejection [of] or disfavor[ing] . . . a section 8 tenancy" and, therefore, did not violate § 46a-64c (a) (3).[6] This appeal followed.

[6] In reaching this conclusion, the trial court focused extensively on Becker and her communications with the plaintiff. The trial court stated: "[F]rom Becker's messages and conduct on March 15, it appears that Becker immediately jumped to the conclusion that [the plaintiff's] section 8 participation was a problem. . . .

"Then, in an exchange of messages between Becker and [the plaintiff] beginning at 10:59 a.m., Becker asked [the plaintiff] if she could call her housing contact because 'the landlord is a flight risk' and is 'trying to back off which is illegal and I will report them.' . . . By 1:35 p.m., Becker messaged [the plaintiff] that '[she] called the president of the real estate board.

Lopez *v.* William Raveis Real Estate, Inc.

On appeal, the plaintiff asks us to direct judgment in her favor, claiming that Henry's statements were facially discriminatory on the basis of her lawful source of income, in violation of § 46a-64c (a) (3), rendering it unnecessary to consider the context of those statements. The plaintiff further claims that the record supports a conclusion as a matter of law that the other defendants, Raveis and the Vaccaros, are vicariously liable for Henry's statements. We address each claim in turn.

I

We begin with the plaintiff's claims with respect to whether the trial court correctly determined that Henry's statements did not violate § 46a-64c (a) (3). Specifically, the plaintiff argues that (1) the trial court applied an improper legal standard in considering this claim, and (2) the trial court's finding that Henry's statements did not convey a discriminatory message to an ordinary listener was clearly erroneous.

A

We first address the plaintiff's claim that the trial court improperly applied the ordinary listener standard articulated by the United States Court of Appeals for the Second Circuit in *Soules* v. *United States Dept. of Housing & Urban Development*, 967 F.2d 817 (2d Cir. 1992), when it considered the context surrounding Henry's statements in determining whether they stated a preference or discriminated on the basis of lawful source of income, in violation of § 46a-64c (a) (3). Relying on the Second Circuit's subsequent decision in

_____

If they do continue with the other offer (that suddenly exists) you have [a] legal case against [the] landlord [and] his agent. Minimum fine is around [$5000] to them.' By 9:05 p.m., Becker told [the plaintiff] that she had a 'perfect paper trail on this discrimination case and [was] reporting [it] to [the relevant state authorities]' and had identified counsel who was willing to help her pursue a discrimination claim.''

Lopez *v.* William Raveis Real Estate, Inc.

*Rodriguez* v. *Village Green Realty, Inc.*, 788 F.3d 31 (2d Cir. 2015), the plaintiff argues that, under *Soules*, the proper analysis of facially discriminatory statements like those made by Henry is limited to whether an ordinary listener would infer that the speaker had stated a preference against a member of the protected class, and does not take into account whether the speaker had the subjective intent to discriminate. To this end, the plaintiff also argues that the trial court improperly failed to decide at the outset whether Henry's statements were facially discriminatory in determining whether it was appropriate to consider their context, instead concluding that it is *always* appropriate to consider context in determining whether a statement violates § 46a-64c (a) (3).

In response, Raveis and Henry argue that the plaintiff misreads *Soules* and that, under that case, the trial court properly considered context in determining whether Henry's statements violated § 46a-64c (a) (3). The Vaccaros, relying on several federal district court decisions following *Soules*, namely, *Thurmond* v. *Bowman*, 211 F. Supp. 3d 554, 566 (W.D.N.Y. 2016), appeal dismissed, Docket No. 16-3545, 2016 WL 10100759 (2d Cir. November 1, 2016), *Short* v. *Manhattan Apartments, Inc.*, 916 F. Supp. 2d 375, 394 (S.D.N.Y. 2012), and *Mancuso* v. *Douglas Elliman LLC*, 808 F. Supp. 2d 606, 625 (S.D.N.Y. 2011), argue that the trial court properly applied the ordinary listener test, as utilized in the Second Circuit, because the ordinary listener always considers statements in their context. We agree with the plaintiff's argument that the ordinary listener considers context only when necessary to analyze a notice, statement, or advertisement that is not clearly discriminatory on its face, but, applying that standard, we conclude that the trial court properly considered context in the present case.

Whether the trial court applied the proper standard for analyzing the statements under § 46a-64c (a) (3)

Lopez *v.* William Raveis Real Estate, Inc.

presents an issue of statutory construction that raises a question of law, over which we exercise plenary review. See, e.g., *Boisvert* v. *Gavis*, 332 Conn. 115, 141, 210 A.3d 1 (2019). "It is well settled that we follow the plain meaning rule pursuant to General Statutes § 1-2z in construing statutes to ascertain and give effect to the apparent intent of the legislature." (Internal quotation marks omitted.) *Ledyard* v. *WMS Gaming, Inc.*, 338 Conn. 687, 696, 258 A.3d 1268 (2021).

As required by § 1-2z, we begin with the text of the statute, which provides in relevant part that it is "a discriminatory practice" to "make, print or publish, or cause to be made, printed or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on . . . lawful source of income . . . or an intention to make any such preference, limitation or discrimination." General Statutes § 46a-64c (a) (3); see footnote 1 of this opinion (complete text of § 46a-64c (a) (1) and (3)).

Section 46a-64c (a) (3) is silent as to the proper standard by which to analyze statements alleged to violate the statute, leaving the statute susceptible to multiple, plausible interpretations as to the proper standard. See *Thomas* v. *Dept. of Developmental Services*, 297 Conn. 391, 400, 999 A.2d 682 (2010) (silence as to scope of provision rendered statute ambiguous with respect to its scope because there was more than one plausible interpretation). When silence renders a statutory provision ambiguous "with respect to [the issue at hand], our analysis is not limited by . . . § 1-2z . . . . In addition to the words of the statute itself, we look to . . . the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and [common-law] principles governing the same general subject matter." (Citation omitted; internal quotation marks omitted.) *Curry* v. *Allan S. Goodman, Inc.*, 286 Conn. 390, 407, 944 A.2d 925 (2008).

Lopez *v.* William Raveis Real Estate, Inc.

Turning to the legislative history, we note that then state Senator Richard Blumenthal described the bill that was enacted in 1990 as the Connecticut Discriminatory Housing Practices Act as having "all the standards and assurances that exist under federal law" and "incorporat[ing] the federal [Fair Housing Act, 42 U.S.C. 3601 et seq. (federal act)] into our state statute . . . ." 33 S. Proc., Pt. 2, 1990 Sess., p. 3494. With no on point discussion in the legislative history of the provision enacted as § 46a-64c (a) (3), we are left to consider how the state fair housing act relates to common-law principles and federal fair housing laws. In interpreting our state fair housing laws, "we are guided by the cases interpreting federal fair housing laws . . . despite differences between the state and federal statutes." (Citation omitted.) *Miko* v. *Commission on Human Rights & Opportunities*, 220 Conn. 192, 202, 596 A.2d 396 (1991); see, e.g., *Curry* v. *Allan S. Goodman, Inc.*, supra, 286 Conn. 407 ("this court previously has determined that Connecticut antidiscrimination statutes should be interpreted in accordance with federal antidiscrimination laws"). We find particularly instructive the constructions of the federal act by the United States Court of Appeals for the Second Circuit in the absence of a United States Supreme Court decision on point. See *Feehan* v. *Marcone*, 331 Conn. 436, 478, 204 A.3d 666 ("[i]n considering claims of federal law, it is well settled that, when the United States Supreme Court has not spoken, we find decisions of the Second Circuit particularly persuasive"), cert. denied,      U.S.     , 140 S. Ct. 144, 205 L. Ed. 2d 35 (2019). Accordingly, we will look to cases interpreting 42 U.S.C. § 3604 (c),[7] which is the

_____

[7] Section 3604 (c) of title 42 of the 2018 edition of the United States Code provides that it is unlawful "[t]o make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex, handicap, familial status, or national origin, or an intention to make any such preference, limitation, or discrimination."

Lopez *v.* William Raveis Real Estate, Inc.

federal counterpart to § 46a-64c (a) (3), even though the state statute is unique insofar as it includes lawful source of income as a protected class.

Our analysis begins with the Second Circuit's decision in *Ragin* v. *New York Times Co.*, 923 F.2d 995 (2d Cir.), cert. denied, 502 U.S. 821, 112 S. Ct. 91, 116 L. Ed. 2d 54 (1991), in which that court analyzed the statutory language of 42 U.S.C. § 3604 (c) in upholding the denial of a motion to dismiss an action claiming that a newspaper had violated the federal act by publishing real estate advertisements that featured virtually no black models, thus indicating a preference for white purchasers. See id., 998–1000. "Beginning [its] analysis with the statutory language, [the Second Circuit noted that] the first critical word is the verb 'indicates.' Giving that word its common meaning, [the court] read the statute to be violated if an ad for housing suggests to an ordinary reader that a particular race is preferred or dispreferred for the housing in question." Id., 999.

"[The court] read the word 'preference' to describe any ad that would discourage an ordinary reader of a particular race from answering it." Id., 999–1000. "Moreover, the statute prohibits *all* ads that indicate a racial preference to an ordinary reader *whatever the advertiser's intent*. To be sure, the intent of the creator of an ad *may* be relevant to a factual determination of the message conveyed . . . but *the touchstone is nevertheless the message*. If, for example, an advertiser seeking to reach a group of largely white consumers were to create advertisements that discouraged potential black consumers from responding, the statute would bar the ads, [regardless of] whether the creator of the ad had a subjective racial intent."[8] (Citation omitted; emphasis

_____

[8] In responding to the plaintiff's reliance on *Ragin* v. *New York Times Co.*, supra, 923 F.2d 995, Raveis and Henry set forth this quoted language without analysis or context. Having considered it, we understand the Second Circuit to mean that the analysis must begin with the message itself, with the speaker's subjective intent only relevant when a court must look beyond

Lopez *v.* William Raveis Real Estate, Inc.

added.) Id., 1000. The court also noted that the "ordinary reader is neither the most suspicious nor the most insensitive of our citizenry." Id., 1002. Considering the advertisement at issue in the context of twenty years of advertisements, the Second Circuit determined that it presented a viable claim of a violation of 42 U.S.C. § 3604 (c) by stating racial preferences in the context of the sale of real estate, emphasizing "a long-standing pattern of publishing real estate ads in which models of potential consumers are always white while black models largely portray service employees, except for the exclusive use of black models for housing in predominantly black neighborhoods." Id., 1001.

Subsequently, the Second Circuit more clearly delineated when and why the ordinary listener considers evidence beyond the statement itself in *Soules* v. *United States Dept. of Housing & Urban Development*, supra, 967 F.2d 817. In *Soules*, the court considered whether a real estate agent violated the federal act by asking a prospective tenant how old her child was because "an elderly person lived in the first floor unit, and . . . she did not want an upstairs resident who would make too much noise." Id., 820. The court stated that, "[i]n cases [in which statements] are clearly discriminatory, a court may look at [the statement] and determine whether it indicates an impermissible preference to an ordinary reader, and inquiry into the author's professed intent is largely unnecessary." Id., 824. The court also stated that, because written content does not communicate the inflection of the speaker, "courts must turn to other evidence in determining whether a violation of the [federal act] occurred." Id., 825. "[Fact finders] may examine intent . . . because it helps determine the manner in which a statement was made and the way an ordinary listener would have interpreted it." Id. Deeming the real estate agent's statement not facially discriminatory, the

the plain language of the statement at issue to determine whether it conveys an impermissible preference.

Lopez *v.* William Raveis Real Estate, Inc.

court stated that the context and intent of the speaker could either expose an impermissible preference or simply explain why the statement was made, and upheld the administrative law judge's conclusion that the statements at issue were made to determine whether the prospective tenants were noisy.[9] Id., 825–26; see also *Jancik* v. *Dept. of Housing & Urban Development*, 44 F.3d 553, 554–55 (7th Cir. 1995) (considering context, including two statements that indicated express preference against children and teenagers, to determine that " 'mature person preferred' " advertisement expressed impermissible preference).

Significantly, the Second Circuit also suggested in *Soules* that context is particularly helpful when there may be a legitimate reason for inquiring into one's status as a protected class, observing that, "whereas [t]here is simply no legitimate reason for considering an applicant's race . . . there are situations in which it is legitimate to inquire about the number of individuals interested in occupying an apartment and their ages." (Internal quotation marks omitted.) *Soules* v. *United States Dept. of Housing & Urban Development*, supra, 967 F.2d 824. "In [*Soules*], for example, [the real estate agent] asked [the perspective tenant] whether her child was noisy and later stated that an elderly tenant 'would probably not be able to take a noisy child running around.' Depending on the context and intent of the speaker, the latter question either could intimate an impermissible preference or simply might explain—to a desired tenant— why the first question had been asked. It also might send a message that a tenant with a noisy child will

---

[9] The Vaccaros argue that the court in *Soules* stated the proper inquiry was whether the ordinary listener, in light of all the circumstances, would have interpreted the statement to indicate an impermissible preference. It is true that the court stated such, but it did so in a portion of the decision immediately *preceding* this section, which distinguished the statements in question from those that are facially discriminatory and discussed the distinct analysis that facially discriminatory statements warrant. See *Soules* v. *United States Dept. of Housing & Urban Development*, supra, 967 F.2d 824.

Lopez *v.* William Raveis Real Estate, Inc.

probably be confronted with regular complaints from the elderly tenant making the apartment less attractive to the prospective tenant.'' Id., 825.

Finally, in *Rodriguez* v. *Village Green Realty, Inc.*, supra, 788 F.3d 36–39, the Second Circuit considered whether there was sufficient evidence to raise a genuine issue of material fact as to whether a real estate agent had violated 42 U.S.C. § 3604 (c) by making certain comments with respect to the tenants' disabled child. Concluding that 42 U.S.C. § 3604 (c) could be violated even if the person who was the subject of the statements did not actually qualify as disabled under the federal act; id., 41; the court explained that it would contradict the language of 42 U.S.C. § 3604 (c) to hold that the inquiry depended on the speaker's subjective state of mind. See id., 53. Rather, the inquiry under 42 U.S.C. § 3604 (c) depends on whether the challenged statement conveyed a prohibited preference to the ordinary listener, with the '' 'touchstone' '' of the inquiry being the message itself.[10] Id. Section 3604 (c) prohibits all ads that indicate an impermissible preference to an ordinary reader, regardless of intent. See id. However, when the message does not convey an impermissible preference on its face, courts may turn to evidence beyond the message to determine whether the ordinary reader would, in fact, interpret the message to violate the statute. See id.

Guided by this Second Circuit case law, we conclude that, when a notice, statement, or advertisement that allegedly violates § 46a-64c (a) (3) is plainly discriminatory on its face, courts need not examine the surround-

---

[10] The defendants argue that the court in *Rodriguez* did not articulate a standard for facially discriminatory statements. However, the court expressly stated that, ''[u]nder [42 U.S.C. §] 3604 (c), the speaker's subjective belief is not determinative. What matters is whether the challenged statements convey a prohibited preference or discrimination to the ordinary listener.'' (Emphasis omitted.) *Rodriguez* v. *Village Green Realty, Inc.*, supra, 788 F.3d 53.

Lopez *v.* William Raveis Real Estate, Inc.

ing context or the speaker's intent to determine whether the statement indicates any impermissible preference, limitation, or discrimination to the ordinary listener. When, however, such a notice, statement, or advertisement is not facially discriminatory, courts may consider the context and intent of the speaker to aid in determining the way an ordinary listener would have interpreted it.[11] In the present case, the trial court did not expressly conclude whether the statements were facially discriminatory, stating only that "Henry made no statement that conveys the message that she was disinclined to proceed with a prospective . . . tenancy [by the plaintiff] because of section 8 program participation." We understand that statement to mean that the court concluded that the statements were not facially discriminatory—a conclusion with which we agree. Thus, it was not improper for the trial court to consider the context of the statements in determining whether they stated a preference with respect to lawful source of income, in violation of § 46a-64c (a) (3).[12]

[11] The three federal District Court cases cited by the Vaccaros do not support their argument that the ordinary listener always considers context in evaluating an allegedly discriminatory statement. In *Mancuso*, the court proceeded to a consideration of context only following its initial assessment that the statement in question did "not clearly convey an impermissible preference to an ordinary person." *Mancuso* v. *Douglas Elliman, LLC*, supra, 808 F. Supp. 2d 626; see *Short* v. *Manhattan Apartments, Inc.*, supra, 916 F. Supp. 2d 394 (reciting standard from *Mancuso*, in which statements in question were not clearly discriminatory and, thus, warranted consideration of context). Further, although the court in *Thurmond* stated that the "ordinary listener hears the statement in context," it proceeded to forgo a consideration of the context as the statements at issue therein were "plainly" in violation of the federal act. *Thurmond* v. *Bowman*, supra, 211 F. Supp. 3d 566; see id., 567 ("[the] statements, in and of themselves, are enough to trigger liability under [42 U.S.C.] § 3604 (c), because the intent of the speaker is not determinative of liability").

[12] We note that the plaintiff claims that the trial court's finding that Henry did not subjectively intend to discriminate was clearly erroneous. We need not consider this claim because, although it would have been proper for the trial court to consider Henry's subjective intent insofar as the statements were not facially discriminatory, we nevertheless agree with Raveis and Henry that the trial court did not do so in its § 46a-64c (a) (3) analysis.

Lopez *v.* William Raveis Real Estate, Inc.

B

We now turn to the plaintiff's contention that the trial court incorrectly concluded that Henry's statements, even when considered in context, would not have conveyed an impermissible preference to an ordinary listener. Under Second Circuit case law, the ordinary listener inquiry is one of fact. See, e.g., *Ragin* v. *Harry Macklowe Real Estate Co.*, 6 F.3d 898, 906 (2d Cir. 1993) ("[T]he inquiry directed by *Ragin* [v. *New York Times Co.*, supra, 923 F.2d 995] is whether a *hypothetical ordinary reader* would find that a defendant's ads expressed an impermissible racial preference. Like the inquiry in negligence cases concerning whether a defendant's conduct conformed with that of the reasonable person, this question is one that the [fact finder] can answer by viewing the ads and the defendants' conduct and then applying common sense." (Emphasis in original.)); *Soules* v. *United States Dept. of Housing & Urban Development*, supra, 967 F.2d 825 ("[i]t is for this reason that [fact finders] may examine intent, not because a lack of design constitutes an affirmative defense to [a] . . . violation [of the federal act], but because it helps determine the manner in which a statement was made and the way an ordinary listener would have interpreted it"); *Ragin* v. *New York Times Co.*, supra, 1000 ("the intent of the creator of an ad may be relevant to a *factual determination* of the message conveyed" (emphasis added)); *Gilead Community Services, Inc.* v. *Cromwell*, 432 F. Supp. 3d 46, 68 (D. Conn. 2019) ("whether the various statements . . . '*convey* a prohibited pref-

Indeed, in its memorandum of decision, the trial court focused on the plaintiff's § 46a-64c (a) (1) claim, including in its findings. It does not address whether the trial court found that Henry intended to indicate a preference in her statements to Becker. The trial court's addendum, which specifically addresses the § 46a-64c (a) (3) claim, similarly lacks a finding as to whether Henry intended her statements to Becker to be discriminatory. The addendum relies on context only to determine how the ordinary listener would have interpreted the nonfacially discriminatory statements.

Lopez *v.* William Raveis Real Estate, Inc.

erence or discrimination to the ordinary listener' . . . should be determined by the jury" (citation omitted; emphasis in original)).

"A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when *although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.*" (Emphasis added; internal quotation marks omitted.) *McKay* v. *Longman*, 332 Conn. 394, 417, 211 A.3d 20 (2019). Further, "[b]ecause it is the trial court's function to weigh the evidence and [to] determine credibility, we give great deference to its findings. . . . In reviewing factual findings, [w]e do not examine the record to determine whether the [court] could have reached a conclusion other than the one reached. . . . Instead, we make every reasonable presumption . . . in favor of the trial court's ruling." (Internal quotation marks omitted.) *Connecticut Light & Power Co.* v. *Proctor*, 324 Conn. 245, 259, 152 A.3d 470 (2016).

We begin with the facts that the trial court included in its addendum discussing the plaintiff's § 46a-64c (a) (3) claim. As support for its conclusion that Henry's statements did not violate § 46a-64c (a) (3), the trial court cited the fact that Henry forwarded a *sample* lease to the plaintiff after finding out about her section 8 status. We fail to see the significance of this fact in light of the overwhelming evidence in the trial court's findings that support the plaintiff's § 46a-64c (a) (3) claim.[13] Immediately prior to learning about the plaintiff's section 8 status, Henry had communicated that the deal was "all set for April 1st." After Henry learned

_____

[13] The trial court also spent a significant portion of its discussion on text messages exchanged between Becker and the plaintiff subsequent to Becker's receipt of the text messages from Henry. See footnote 6 of this opinion. We disagree with the trial court's extensive reliance on these statements because Becker's subjective reaction to Henry's statements hardly informs how an ordinary listener would understand Henry's statements.

Lopez *v.* William Raveis Real Estate, Inc.

of the plaintiff's section 8 status, she abruptly shifted gears to inform Becker that (1) they did "not have an offer without a signed lease," (2) Henry was "not sure [Vacarro] would want to wait," as she knew it took "a couple of weeks for the process," and (3) according to Henry, Vaccaro had to decide "whether he would want to wait for the section 8 program process to run its course given his expressed desire to have the [rental apartment] rented by April 1, 2017," as the trial court stated. In the hours following her receipt of the plaintiff's section 8 forms, Henry stated four separate times that she was not previously aware of the plaintiff's intention to use a section 8 voucher to pay the rent.

The Vaccaros argued that the fact that the plaintiff's initial paperwork was incomplete was also relevant to place Henry's statements in context, as was the existence of the competing offer from Thompson and Dyer. The facts, however, undermine the strength of this argument. After the plaintiff's initial submission of incomplete paperwork, Henry had stated that the deal was still "all set for April 1st." In regard to the competing offer, the trial court found that it was e-mailed to Henry at 11:37 a.m. on March 15, 2017. By that time, Henry had already made two of the four statements at issue and had stated that she was not sure Vaccaro would want to wait. The chronology of events does not reasonably permit her to rely on the competing offer to explain the statements that she made earlier that morning.

Thus, the trial court's ultimate finding that the ordinary listener would not have inferred that Henry's statements indicated any preference, limitation or discrimination was inconsistent with all but one of the subordinate facts it found. Put differently, Henry's statements could not reasonably be understood in context to mean anything other than that the plaintiff's intention to use her section 8 voucher to pay the rent would be a stumbling block to completing the transaction.

Lopez *v.* William Raveis Real Estate, Inc.

Beyond being inconsistent with the other facts it found, the trial court's conclusion undercuts the broad protections provided by § 46a-64c (a) (3). As the plaintiff argues, the purpose of 42 U.S.C. § 3604 (c), the federal provision on which § 46a-64c (a) (3) is modeled, "is to protect against the 'psychic injury' caused by discriminatory statements made in relation [to] the housing market."[14] See R. Schwemm, "Discriminatory Housing Statements and § 3604 (c): A New Look at the Fair Housing Act's Most Intriguing Provision," 29 Fordham Urb. L.J. 187, 249–50 (2001); see also *United States* v. *Space Hunters, Inc.*, 429 F.3d 416, 424–25 (2d Cir. 2005) ("[T]he [D]istrict [C]ourt's view that [the provision's] purpose is to 'prevent expressions that result in the denial of housing' is too narrow. The statute also 'protect[s] against [the] psychic injury' caused by discriminatory statements made in connection with the housing market. . . . If that were not so, Congress likely would not have made [the provision] applicable to dwellings that are otherwise exempt from [the act's] prohibition on discrimination." (Citations omitted.)). Our statute mirrors the broad language of the federal provision and differs only in its inclusion of additional protected classes, such as lawful source of income. See footnotes 1 and 7 of this opinion.

The protections against psychic injury provided by § 46a-64c (a) (3) are particularly significant with respect

_____

[14] We note that 42 U.S.C. § 3604 (c) is itself broader than the other federal antidiscrimination laws on which it is modeled, namely, Title VII of the Civil Rights Act, which provides in relevant part: "It shall be an unlawful employment practice for an employer . . . to print or publish or cause to be printed or published any notice or advertisement relating to employment . . . indicating any preference, limitation, specification, or discrimination, based on race, color, religion, sex, or national origin . . . ." 42 U.S.C. § 2000e-3 (b) (2018). Section 3604 (c) expanded those protections into the fair housing context by adding "statement[s]" to the practices banned by the provision and by adding language that brought even stated intentions under the protection of fair housing laws. 42 U.S.C. § 3604 (c) (2018). That expansion was consistent with an overarching goal of the federal act, which is to promote "truly integrated and balanced living patterns." 114 Cong. Rec. 3422 (1968), remarks of Senator Walter F. Mondale.

Lopez *v.* William Raveis Real Estate, Inc.

to lawful source of income. "Unlike the federal provisions governing section 8, the provisions of § 46a-64c, which require landlords to accept otherwise qualified tenants whose lawful source of income may include section 8 housing assistance, are *mandatory.* Pursuant to this statute, it is a part of the public policy of this state that landlords may not discriminate against housing applicants because such applicants, otherwise qualified as potential tenants, look to section 8 assistance for payment of the stipulated rent."[15] (Emphasis added.) *Commission on Human Rights & Opportunities* v. *Sullivan Associates*, 250 Conn. 763, 774, 739 A.2d 238 (1999). The statute reflects "the legislature's manifest intent to afford low income families access to the rental housing market." Id., 782. Given the mandatory nature of the section 8 program in Connecticut, landlords may not justify disfavoring housing vouchers, which are a lawful source of income, by claiming reluctance to undertake the various administrative burdens that attend participation, such as undergoing rental unit inspections.[16]

---

[15] In contrast, in states with voluntary section 8 programs, statutes banning lawful source of income discrimination often have been read to allow landlords to refuse a section 8 tenant for legitimate business reasons related to compliance with that program's requirements. See, e.g., *Dussault* v. *RRE Coach Lantern Holdings*, *LLC*, 86 A.3d 52, 60 (Me. 2014) ("We recognize the . . . purpose [of the Maine Human Rights Act] to protect public assistance recipients' rights to secure decent housing. We will not, however, read into [that act] a mandate that landlords accept terms of tenancy that are otherwise required only if the landlord chooses to participate in a voluntary federal program."); *Edwards* v. *Hopkins Plaza Ltd. Partnership*, 783 N.W.2d 171, 177 (Minn. App. 2010) ("Minnesota law does not require property owners in Minnesota to participate in [s]ection 8 programs. . . . And we conclude that refusal to participate in a voluntary program for a legitimate business reason does not constitute discrimination under the [Minnesota Human Rights Act]." (Citations omitted.)).

[16] However, "nothing in the statutes forbidding discrimination against tenants receiving section 8 rental subsidies requires landlords to accept tenants who may be unqualified to rent for nondiscriminatory reasons such as, for example, a poor rental history, poor references, or poor credit. The target of the statutes is, instead, the unspoken presumption that section 8 assistance recipients, by virtue only of their source of income, are undesirable tenants for a landlord's rental properties." (Footnote omitted.) *Commission on*

Lopez *v.* William Raveis Real Estate, Inc.

See id., 778–82 (rejecting claim that exception existed under antidiscrimination provision allowing landlords not to participate in section 8 program by refusing use of statutorily mandated lease); see also *DiLiddo* v. *Oxford Street Realty, Inc.*, 450 Mass. 66, 77, 876 N.E.2d 421 (2007) (declining to carve out exception to mandatory section 8 program in Massachusetts for landlords facing substantial economic harm from compliance with its requirements).

Thus, given that the plaintiff indicated that she would have been able to meet Vaccaro's desired occupancy date of April 1, 2017, particularly with Becker's demonstrated desire to expedite the transaction, any preference to avoid the administrative process of the section 8 program in this transaction could not have been a determinative consideration in Vaccaro's rental decision under § 46a-64c (a) (1), which, ipso facto, renders it impermissible under § 46a-64c (a) (3) for Henry to express that Vaccaro planned to consider the length of the section 8 process in his rental decision.[17] Henry stated that she was "not sure if [Vaccaro] wants to [wait] through the process" and that it was up to him. By expressing that Vaccaro may not want to participate

_____

*Human Rights & Opportunities* v. *Sullivan Associates*, supra, 250 Conn. 776.

[17] This is not to say that the plaintiff's status as a section 8 voucher holder automatically required the Vaccaros to rent the apartment to her, or otherwise privilege her application over other applications. Indeed, the trial court found credible Vaccaro's testimony that Thompson and Dyer presented a better offer. This illustrates the distinction between the protections offered by subdivisions (1) and (3) of § 46a-64c (a). Subdivision (3) prohibits all statements that express even an intention to indicate a preference or limitation based on any of the protected classes. As a result, there can be a violation of § 46a-64c (a) (3) even in the absence of a violation of § 46a-64c (a) (1). Put differently, the defendants did not violate the housing discrimination statute by the act of communicating and taking a better offer. Rather, Henry violated the statute by making a statement that an ordinary listener surely would understand to mean that the section 8 approval process could be a determinative consideration in the rental decision, when, as previously discussed, it cannot be.

Lopez *v.* William Raveis Real Estate, Inc.

in the section 8 approval process, and that the transaction may not proceed after Becker had surprised her with the plaintiff's section 8 status, Henry indicated that the administrative process would be a significant consideration in Vaccaro's rental decision, which is a clear indication of an intention to make a preference based on lawful source of income.

The trial court ultimately concluded that Henry's statements "would not have been understood as discriminatory by an ordinary listener . . . ." However, a violation of § 46a-64c (a) (3) does not require discriminatory animus. Nor does it require a rejection of or disfavoring a lawful source of income. Section 46a-64c (a) (3) bars statements that a reasonable listener would understand to *convey* an intention to make any such "preference, limitation, or discrimination . . . ." In light of the broad language of § 46a-64c (a) (3) and the abundance of facts supporting an inference that the ordinary listener would have understood Henry's statements to fall within the reach of the statute, we are left with a definite and firm conviction that the trial court's conclusion was not simply an alternative yet permissible view of the evidence. See, e.g., *American Diamond Exchange, Inc.* v. *Alpert,* 101 Conn. App. 83, 96, 920 A.2d 357 ("whe[n] there are two permissible views of the evidence, the [fact finder's] choice between them cannot be clearly erroneous" (internal quotation marks omitted)), cert. denied, 284 Conn. 901, 931 A.2d 261 (2007). It was clear error for the trial court to find that Henry's statements did not indicate even so much as an intention to make an impermissible consideration of section 8 in the rental decision. Accordingly, we conclude that the plaintiff is entitled to judgment as a matter of law as to liability on her § 46a-64c (a) (3) claim against Henry,[18] with remand to the trial court

---

[18] Although there are instances in which a reversal by this court based on a holding of clear error required a new trial as an appellate remedy; see, e.g. *McDermott* v. *State,* 316 Conn. 601, 611, 113 A.3d 419 (2015) (determining

Lopez *v.* William Raveis Real Estate, Inc.

necessary for consideration of the plaintiff's claims for damages, attorney's fees, and declaratory and injunctive relief. See, e.g., *Channing Real Estate, LLC* v. *Gates*, 326 Conn. 123, 132–33, 161 A.3d 1227 (2017).

II

Because the trial court rendered judgment in favor of the defendants on the basis of its conclusion as to Henry's statements, it did not reach the plaintiff's derivative liability claims. The plaintiff argues that there is sufficient evidence in the record to conclude as a matter of law that, pursuant to General Statutes § 20-312a,[19] Raveis is vicariously liable for Henry's conduct. The plaintiff also asserts that, by virtue of authorizing Raveis and Henry to list a unit that he and his wife owned, Vaccaro created an agency relationship with

that requirement of different legal standard generally entitles parties to new trial); *Naples* v. *Keystone Building & Development Corp.*, 295 Conn. 214, 225, 990 A. 2d 326 (2010) (trial court's damages award was clearly erroneous and case was remanded for new trial limited to determining adequate damages); a review of our case law does not require a new trial as to liability in the present case. We find persuasive our recent decision in *Bilbao* v. *Goodwin*, 333 Conn. 599, 217 A.3d 977 (2019). In that case, we reviewed the trial court's factual determination that an agreement was not supported by consideration. See id., 617. In determining that the trial court's finding was clearly erroneous and that the agreement was supported by consideration, this court cited inconsistent facts and facts supporting the contrary conclusion, as well as the trial court's improper reliance on certain case law. See id., 617–20. Rather than remanding the case for a new trial, this court remanded with direction to render the judgment the trial court would have rendered in the absence of its clearly erroneous factual finding. See id., 623; see also *Wesley* v. *Schaller Subaru, Inc.*, 277 Conn. 526, 556–57, 893 A.2d 389 (2006) (concluding that trial court's agency determination was clearly erroneous and directing judgment consistent with lack of agency relationship); *Echavarria* v. *National Grange Mutual Ins. Co.*, 275 Conn. 408, 419–20, 880 A.2d 882 (2005) (concluding that trial court's finding of actual notice was clearly erroneous and directing judgment consistent with lack of notice).

[19] General Statutes § 20-312a provides: "In any action brought by a third party against a real estate salesperson affiliated with a real estate broker as an independent contractor, such broker shall be liable to the same extent as if such affiliate had been employed as a real estate salesperson by such broker."

Lopez *v.* William Raveis Real Estate, Inc.

the Vaccaros as the principals and Raveis and Henry as their agents, and, thus, the Vaccaros are vicariously liable for the tortious acts of Raveis and Henry. In response, the defendants claim that agency law requires a fact intensive inquiry, and, because the trial court did not adjudicate the vicarious liability claims against them, there is no record for this court to consider. We agree with the plaintiff that Raveis is vicariously liable for Henry's statements as a matter of law but disagree with respect to the Vaccaros.

This court need not remand the case for the trial court's decision on the issue of vicarious liability if it can be determined as a matter of law on the record before us. See *Hudson Wire Co.* v. *Winsted Brass Workers Union*, 150 Conn. 546, 552, 191 A.2d 557 (1963). In other words, if the evidence necessary for resolution is undisputed, then this court can decide the issue as a matter of law without need for a remand for factual findings. See, e.g., *Salmon* v. *Dept. of Public Health & Addiction Services*, 259 Conn. 288, 309–310, 788 A.2d 1199 (2002); see also *Allstate Ins. Co.* v. *Palumbo*, 296 Conn. 253, 267–68, 994 A.2d 174 (2010) (citing cases).

Again, turning to cases interpreting the federal act, we note that the United States Supreme Court has stated that the federal statute incorporates "ordinary [tort related] vicarious liability rules . . . ." *Meyer* v. *Holley*, 537 U.S. 280, 285, 123 S. Ct. 824, 154 L. Ed. 2d 753 (2003). As applied in the state law context, under this court's well established vicarious liability jurisprudence, an employer is liable for the negligent and wilful torts of an employee that occurred within the scope of employment and were done in furtherance of the employer's business. E.g., *A-G Foods, Inc.* v. *Pepperidge Farm, Inc.*, 216 Conn. 200, 208, 579 A.2d 69 (1990); see *Matthiessen* v. *Vanech*, 266 Conn. 822, 840 n.16, 836 A.2d 394 (2003) ("an employer generally is liable for intentional torts committed by his employees to the

Lopez *v.* William Raveis Real Estate, Inc.

same extent that he is liable for damages arising out of the negligent or reckless conduct of those employees'').

In Connecticut, the vicarious liability of a real estate broker is governed by § 20-312a, which provides: ''In any action brought by a third party against a real estate salesperson affiliated with a real estate broker as an independent contractor, such broker shall be liable to the same extent as if such affiliate had been employed as a real estate salesperson by such broker.'' The parties stipulated to the fact that Raveis is a broker and that Henry is a real estate salesperson associated with Raveis by an independent contractor agreement. The trial court also made these findings in its memorandum of decision. Thus, under § 20-312a, Raveis is liable to the same extent as if Henry were its employee.

The trial court found that Henry acted on behalf of Raveis when she executed the exclusive right to lease listing contract with Vaccaro in relation to the rental apartment. It cannot reasonably be contended that statements made about the plaintiff's prospective tenancy in the Vaccaros' rental apartment were not in furtherance of the listing contract, and there is no evidence to suggest that Henry's conversations with Becker in regard to the rental apartment were outside the scope of that engagement. Therefore, we conclude as a matter of law that Raveis is vicariously liable for Henry's statements in violation of § 46a-64c (a) (3).

The plaintiff also asserts that, having authorized Raveis and Henry to list a unit that he and his wife owned, Vaccaro created an agency relationship with the Vaccaros as the principal and Raveis and Henry as their agents, and, thus, the Vaccaros are vicariously liable for the wrongful acts of those agents. At oral argument before this court, counsel for the Vaccaros argued that Vaccaro hired Henry as an independent contractor and provided no training, tools, equipment or instructions, other than the desired amount of rent,

Lopez *v.* William Raveis Real Estate, Inc.

and, thus, cannot be held liable for her wrongful acts. We agree with the Vaccaros and conclude that Henry had an independent contractor relationship with them for purposes of their vicarious liability.

A principal is generally liable for the authorized acts of their agent. E.g., *Rich-Taubman Associates* v. *Commissioner of Revenue Services*, 236 Conn. 613, 619, 674 A.2d 805 (1996). Agency is "the fiduciary relationship [resulting] from [the] manifestation of consent by one person to another that the other shall act on his [or her] behalf and subject to his [or her] control, and consent by the other so to act . . . ." (Internal quotation marks omitted.) *Fiano* v. *Old Saybrook Fire Co. No. 1, Inc.*, 332 Conn. 93, 102, 209 A.3d 629 (2019). "The test of the [agency] relationship is the right to control. It is not the fact of actual interference with the control, but the right to interfere, that makes the difference between an independent contractor and a servant or agent." (Internal quotation marks omitted.) *Tianti* v. *William Raveis Real Estate, Inc.*, 231 Conn. 690, 697, 651 A.2d 1286 (1995). Further, "[a]n independent contractor has been defined as one who, exercising an independent employment, contracts to do a piece of work according to his own methods and without being subject to the control of his employer, except as to the result of his work." (Internal quotation marks omitted.) Id.

Turning to the record, we observe that the listing contract Henry executed between Raveis and Vaccaro stated that "[Raveis] will use reasonable efforts to lease the [rental apartment]." This provision does not state or imply that the Vaccaros had the right to intervene as to the means or methods by which to lease the listed property. Outside of the limited terms of the listing contract, there is no evidence to suggest that Vaccaro had the right to control anything other than the result, namely, the terms of the lease and which offer he

Lopez *v.* William Raveis Real Estate, Inc.

accepted.[20] Accordingly, we conclude that Vaccaro and Henry had an independent contractor relationship as a matter of law.

Generally, an employer is not liable for the torts of its independent contractors. E.g., *Gazo* v. *Stamford*, 255 Conn. 245, 257, 765 A.2d 505 (2001). "The explanation for [this rule] most commonly given is that, [because] the employer has no power of control over the manner in which the work is to be done by the contractor, it is to be regarded as the contractor's own enterprise, and [the contractor], rather than the employer, is the proper party to be charged with the responsibility of preventing the risk, and bearing and distributing it." (Internal quotation marks omitted.) *Pelletier* v. *Sordoni/Skanska Construction Co.*, 264 Conn. 509, 517–18, 825 A.2d 72 (2003).

The plaintiff raised an exception to this general principle in its brief to this court, at least as to Eve Vaccaro. Relying on *Alexander* v. *Riga*, 208 F.3d 419, 432–33 (3d Cir. 2000), cert. denied, 531 U.S. 1069, 121 S. Ct. 757, 148 L. Ed. 2d 660 (2001), the plaintiff argues that the duty not to discriminate is nondelegable in nature. This court has previously stated that "[t]he nondelegable duty doctrine is . . . an exception to the rule that an employer may not be held liable for the torts of its independent contractors." *Gazo* v. *Stamford*, supra, 255

_____

[20] The plaintiff also did not provide any support for holding an owner liable for the wrongful acts of a real estate salesperson. The case cited by the plaintiff purporting to do so in its posttrial memorandum actually involved vicarious liability for the actions of an agent acting as a property manager. Although it is well established that, under the federal act, "owners of real estate may be held vicariously liable for discriminatory acts by their agents and employees"; (internal quotation marks omitted) *United States* v. *Hylton*, 944 F. Supp. 2d 176, 190 (D. Conn. 2013), aff'd, 590 Fed. Appx. 13 (2d Cir. 2014); the plaintiff does not provide any authority for the proposition that real estate salespersons who are hired as independent contractors under circumstances similar to those in the present case are deemed to be agents for purposes of tort liability, and our independent research does not reveal any.

Lopez *v.* William Raveis Real Estate, Inc.

Conn. 257. The United States Supreme Court, however, has held that the duty not to discriminate under the federal act is not nondelegable in nature because a conclusion to the contrary would extend vicarious liability beyond the ordinary tort principles imposed by the federal act. See *Meyer* v. *Holley*, supra, 537 U.S. 286; see also id., 290. Having concluded that Henry was an independent contractor, and, in the absence of an exception to the general rule that employers are not liable for the torts of their independent contractors, we conclude that the Vaccaros are not vicariously liable for any of Henry's statements that constitute a violation of § 46a-64c (a) (3).[21]

The judgment is reversed in part and the case is remanded with direction to render judgment for the plaintiff as to liability against the defendants Sarah Henry and William Raveis Real Estate, Inc., in connection with the plaintiff's claim under § 46a-64c (a) (3) and for further proceedings in accordance with this opinion; the judgment is affirmed with respect to the trial court's determination that the defendants Anthony Vaccaro and Eve Vaccaro were not liable to the plaintiff.

In this opinion the other justices concurred.

---

[21] Because we conclude that Vaccaro, the contracting owner involved in the transaction, is not vicariously liable, we can assume without deciding that Eve Vaccaro, a noncontracting owner of the rental apartment, is similarly not subject to vicarious liability.